No. 12124

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

---

EDWARD C. LAHMAN and
MARGARET KATHERINE LAHMAN,

                    Plaintiffs and Appellants,

    -vs-

ROCKY MOUNTAIN PHOSPHATE COMPANY,
a Corporation,

                    Defendant and Respondent.

---

Appeal from:  District Court of the Third Judicial District,
              Honorable Nat Allen, Judge presiding.

Counsel of Record:

    For Appellants:

        M. K. Daniels argued, Deer Lodge, Montana.
        C. W. Leaphart, Helena, Montana.

    For Respondent:

        Malcolm MacCalman argued, Deer Lodge, Montana.
        Knight, Dahood and Mackay, Anaconda, Montana.

---

                        Submitted:  October 26, 1972

                          Decided:  DEC - 4 1972

Filed: DEC - 4 1972

_Thomas J. Kearney_
                                        Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This is an appeal from a judgment entered on a jury verdict for defendant after motion for a new trial was denied.

Plaintiffs are man and wife. They own a small ranch in Powell County upon which they operate a trailer court. On March 29, 1968, they filed an action to recover damages for injury to their person and property, and for loss of profits to their business caused by smoke and fluoride effluents from defendant's phosphate manufacturing company.

Defendant, Rocky Mountain Phosphate Company, produces an animal feed supplement from phosphate rock. In August 1963, defendant commenced operations in the Garrison area at its plant located about 1600 feet north and west of the plaintiffs' trailer court and residence.

Soon after defendant began operations, complaints were made by plaintiffs and other residents of the Garrison area. The complaints were based mostly on the smoke which produced a stinging sensation on contact and on the odor of the effluents. Several injunctive hearings and trials were held and the State Board of Health became a participant. In March 1965, defendant adopted several techniques to eliminate the basis for complaints and converted its manufacturing process from a sulphuric acid method to a soda-ash process. This eliminated all effluents of sulphuric acid, including the noxious odor and the stinging effect which was caused by a type of sulphuric acid. The volume of smoke was drastically reduced. Scrubbing systems were installed with varying degrees of success. Finally, in 1968, a "Teller" scrubbing system was installed which system reduced the amount of fluorides discharged into the air from approximately 4,000 pounds per day in 1963 to less than 10 pounds, and has eliminated the discharge of smoke except for a negligible plume.

After defendant had been in operation for some four and one-half years, and after three years of marked reduction in the discharge of nuisance effluents, plaintiffs filed their action in which they claimed damages for personal injury, loss of enjoyment of their property, and loss of business.

Jury trial was had resulting in a verdict for defendant.

The issues on appeal are four in number. The first two deal with the statute of limitations. (1) Whether the trial court erred in permitting defendant to amend its answer whereby the statute of limitations and laches were pleaded. (2) The trial court erred in instructing the jury that the two-year statute, section 93-2607, R.C.M. 1947, as applied to the property damages, applies. Plaintiffs urge that section 93-2613, R.C.M. 1947, a five-year statute, applies or none at all.

As to issue 1, plaintiffs were notified four days previous to trial of defendant's intention to amend; and, when the motion was made on the day of trial counsel at first objected, then advised the court that plaintiffs would have no objection if they were allowed to present evidence showing progression of damages. The trial court allowed plaintiffs to put in evidence almost without restriction as to the "progression of damages". No prejudice is shown in the trial court's ruling. See: Rule 15, M.R.Civ.P.

On issue 2, concerning the statute of limitations, plaintiffs were allowed to put in evidence as to date almost without restriction. On the settlement of instructions, the following appears:

"THE COURT: All right, No. 11 is withdrawn. Considering No. 12.

"MR. DANIELS: [Counsel for plaintiffs] We are going to object to the giving of the Defendant's Instruction 12, your honor, on the grounds that the statute of limitations on a recurring nuisance, which is what this constitutes, does not commence until such time as the nuisance ceases, and had the nuisance ceased in 1965, then, of course, this would be an appropriate instruction, but the nuisance recurred on almost a

weekly basis, and the statute just simply does not run on these recurring instances on these nuisances.

"MR. DAHOOD: [Counsel for defendant] The authority on recurring nuisances is that the statute runs from the date of each nuisance.

"THE COURT: Overruled. No. 12 is given.

"(DEFENDANT"S PROPOSED INSTRUCTION NO. 12 WAS GIVEN AS THE COURT'S INSTRUCTION NO. 18:)

"The jury is instructed that the period fixed by statute for bringing an action for personal injuries is three (3) years preceding the date of filing the complaint. In this case the statute of limitations having been pled as a defense by the defendant, all evidence pertaining to personal injuries occurring prior to March 28, 1965, is to be disregarded and given no consideration.

"Given: Nat Allen, Judge.

"THE COURT: Take up Defendant's No. 13.

"MR. LEAPHART: [Counsel for plaintiffs] For the record, your honor, we will make the same objection as we did to Defendant's Proposed Instruction No. 12.

"THE COURT: Overruled. No. 13 is given.

"(DEFENDANT'S PROPOSED INSTRUCTION NO. 13 WAS GIVEN AS THE COURT'S INSTRUCTION NO. 19:)

"The jury is instructed that the period fixed by statute for bringing an action for injury to property as alleged by the plaintiffs in this case is two (2) years prior to the date of filing the complaint. In this case, the statute of limitations having been pled as a defense by the defendant, all evidence pertaining to injuries to property occurring prior to March 28th, 1966, is to be disregarded and given no consideration.

"Given: Nat Allen, Judge."

Now, on appeal, counsel recognizes that the objections to the instructions were inadequate but counsel says that he did not have adequate time to research the matter because the pleadings were not amended until the day of trial. We are not impressed with this argument. However, in considering the issue on its merits, as to the damages to property, plaintiffs argue that section 93-2613, R.C.M. 1947, is the correct period of limitations; that is, five years. Plaintiffs cite Watson v. Colusa-Parrot M. & S. Co., 31 Mont. 513, 79 P. 14. In the year

1904, the statute, Section 524 (Code of Civil Procedure 1895) provided in part:

"An action for waste or trespass on real property * * * shall be commenced within two years."

The Court in Watson said that if any statute of limitations was applicable to the nuisance case involving pollution of a river, it was then Section 518 (now section 93-2613, R.C.M. 1947). Following that, by Chapter 172, Session Laws 1921, Section 524 was amended and became Section 9033, R.C.M. 1921, and read in part:

"Within two years:

"* * *

"(2) An action for injury to or for waste or trespass on real or personal property * * *."
(Emphasis supplied)

The language remains the same in section 93-2607, R.C.M. 1947. Thus Watson is no longer applicable and the court's Instruction No. 19 was correct.

Also, plaintiffs seem to argue that the nuisance was intermittent; and thus a different rule would apply. However, plaintiffs' evidence was clearly to the effect that the alleged nuisance was continuous and unremitting. We find no error as to issues 1 and 2.

Issue 3 is whether the court erred in refusing the following instruction:

"You are instructed that the rule of damage for permanent injury to land is the difference between the value of the land prior to the claimed injury and its value after the claimed injury."

At the settlement of instructions, the following appears:

"THE COURT: Taking up Plaintiffs' No. 5.

"MR. DAHOOD: We object to No. 5, your honor, upon the ground and for the reason that there has been no evidence introduced indicating any permanent injury to the land, and upon the further ground that where the damage consisted of loss of rental value the true measure of damage is the diminution of rental value, and not the question of whether or not there was permanent injury to the land.

"MR. DANIELS: Well, it is the position of the Plaintiffs, of course, that there has been permanent injury to the land as testified to by Dr. Gordon in his explanation of the ecological change which will appear, and which has appeared, and which will be permanent in nature.

"THE COURT. No. 5 is refused."

Plaintiffs simply had no evidence of permanency of damage to their land. Plaintiffs leased their lands for agricultural purposes. Rental payments were not reduced. No evidence was offered showing any permanent damage. Other instructions covered damages and we find no error in the refusal of plaintiffs' proposed instruction No. 5.

Issue 4 is that the evidence was insufficient to support the jury verdict in that the jury totally disregarded credible, uncontradicted evidence that defendant maintained a nuisance from the date of the plant construction to the date of trial. In their complaint, plaintiffs prayed for judgment for damages for injury to person, property, and business in the amount of $150,000 and for an injunction. Nominal damages were not sought.

The case, in our view, is a classic example of the jury's hearing all of the evidence and not believing some of it. There was conflicting evidence and the jury was free to weigh the conflicting testimony and determine which was credible and to determine whether or not plaintiffs sustained their burden of proof. We observe that the trial judge allowed plaintiffs great latitude in presenting evidence.

Finding no error, the judgment is affirmed.

_____
Associate Justice

- 6 -

We Concur:

_____
Chief Justice

_____

_____
Associate Justices

_____
Hon. L. C. Gulbrandson, District
Judge, sitting for Associate
Justice Frank I. Haswell.

Mr. Justice John Conway Harrison dissenting:

I find it necessary to disagree with the holding of the majority. In reading the summation of facts as set forth in the majority opinion, it is difficult to understand why a legal action was instituted by plaintiffs. The facts as I read them are:

Plaintiff Edward C. Lahman had lived on the property, some 400 plus acres, most of his 70 years. He married plaintiff Margaret Lahman in 1946, and after remodeling the home on the property they have lived there since 1947. Originally the ranch was a dairy operation. In 1954, plaintiffs developed a trailer court operation to supplement their income. While the two uses of the property did not make them wealthy, it did provide a living which kept them busy and able to live as they desired. This way of life was rudely interrupted in 1962, when they had a new neighbor move within 1600 feet of their home; that neighbor was defendant Rocky Mountain Phosphate Company, which manufactures an animal feed supplement from phosphate rock.

The background of Rocky Mountain Phosphate Company is of interest because of what plaintiffs allege happened to them after it began operating in the Garrison area. This Court began hearing about defendant early in the 1960's when it opened operations in Butte, Montana. Due to the same complaints we have here, defendant was literally run out of Butte. In place of picking a plant site in an area where the wind would disperse air pollutants, defendant chose instead to locate its plant in what is described as a "rolling valley", subject to inversion situations. The plant was constructed during the years 1962-1963, and from the time it began operation it has been in legal difficulties in the district courts of this state and in this Court. Dutton, Mollenberg v. Rocky Mtn. Phosphates, 151 Mont. 54, 438 P.2d 674; Mollenberg v. Rocky Mountain Phos. Co., 152 Mont. 352,

450 P.2d 672. See also Charles R. Lee v. Rocky Mt. Phosphate Co., Case No. 10595, filed in this Court's Clerk's office on May 9, 1963.

In addition to the state legal actions, we note that the first federal hearing --- the Powell County Air Pollution Abatement Conference HEW--Public Health Service National Center for Air Pollution Control---was held in July 1967, because of the operations of defendant.

In the four year period from September 1963, when the plant began operation, to July 1967, it poured into the Garrison area some two tons of fluorides. Between September 1963 and March 19, 1964, school operations in the area were interrupted some 35 times. The physical complaints registered by human inhabitants were "a stinging sensation on face, coughing, burning eyes, burning noses and such as that." Its effect on animal and plant life took longer to detect.

In March 1965, defendant improved the situation somewhat by reducing both sulphur dioxide and fluoride emissions. In late 1968, a Teller scrubber was finally installed. In 1967, prior to the installation of the scrubber, Montana's Ambient Air Quality Standards were established. Following the establishment of such standards, the measurement of fluoride concentrations in the Garrison area, and particularly on plaintiffs' property, were monitored. A standard of .3 micrograms per square centimeter for 28 days was established as a maximum allowable limit, above which damage to grass, trees, and man occurs.

After that standard was established, the following tests, introduced as exhibits at trial, reveal the following concentrations of fluorides on plaintiffs' property:

| Exhibit No. | Date | Concentration |
|---|---|---|
| Ex. 3 | 4/25/67 to 5/23/67 (IN Screen) | 9.2mg/cm2/28 days |
| | 4/24/67 to 5/23/67 (NO Screen) | 13/9mg/cm2/28 days |
| Ex. 4 | 7/18/68 to 8/19/68 | .18 ug/cm2/28 days (RMP not operating) |
| Ex. 5 | 8/19/68 to 9/18/68 | .21 ug/cm2/28 days (Not operating) |
| Ex. 6 | 9/19/68 to 10/16/68 | .31/ug/cm2/28 days (Not operating) |
| Ex. 7 | 10/16/68 to 11/13/68 | .18 ug/cm2/28 days (Not operating) |
| Ex. 8 | 11/13/68 to 12/12/68 | 1.36 ug/cm2/28 days (operating from Nov 19) |
| Ex. 9 | 12/12/68 to 1/10/69 | .75 ug/cm2/28 days |
| Ex. 10 | 1/10/69 to 2/10/69 | .41 ug/cm2/28 days |
| Ex. 11 | 2/10/69 to 3/10/69 | .58 ug/cm2/28 days |
| Ex. 12 | 2/10/69 to 3/10/69 | 1.06 ug/cm2/28 days |
| Ex. 13 | 3/10/69 to 4/7/69 | 1.16 ug/cm2/28 days |
| Ex. 14 | 4/7/69 to 5/5/69 | 35 ug/cm2/28 days |
| Ex. 15 | 5/5/69 to 6/2/69 | .78 ug/cm2/28 days |
| Ex. 16 | 6/2/69 to 6/30/69 | 1.7 ug/cm2/28 days |
| Ex. 17 | 6/30/69 to 7/28/69 | 1.0 ug/cm2/28 days |
| Ex. 18 | 7/28/69 to 8/29/69 | 1.0 ug/cm2/28 days |
| Ex. 19 | 8/27/69 to 9/26/69 | 5.09 ug/cm2/28 days |
| Ex. 20 | 9/26/69 to 10/22/69 | 6.5 ug/cm2/28 days |
| Ex. 21 | 10/22/69 to 11/24/69 | 4.02 ug/cm2/28 days |
| Ex. 22 | 11/24/69 to 12/22/69 | 87 ug/cm2/28 days |
| Ex. 23 | 12/22/69 to 1/21/70 | 1.46 ug/cm2/28 days (operation stopped Jan 19) |
| Ex. 24 | 1/21/70 to 2/24/70 | 75 ug/cm2/28 days (Not Operating) |
| Ex. 25 | 2/24/70 to 3/25/70 | .46 ug/cm2/28 days (Started March 4) |
| Ex. 26 | 3/25/70 to 4/29/70 | 65 ug/cm2/28 days ." |

From these exhibits it can be seen that even after the Teller scrubber was installed, that month after month, year after year, plaintiffs were subjected to far beyond the maximum permissible level of fluoride emissions.

Plaintiffs, almost from the beginning of defendant's plant operation, have been invaded by noxious odors of sulphur dioxide and fluorides. They have suffered sore throats, sore eyes, burned lips, severe headaches and have had countless sleepless nights. Plaintiff Edward Lahman developed a sinus condition and was bothered by a shortness of breath when he exerted himself. He went to his family physician, Dr. Benjamin of Deer Lodge, who had cared for him since 1949. Dr. Benjamin saw him in 1961, and then began seeing him fairly regularly after October 1968. At that time Dr. Benjamin found he had a soreness of the mouth and tongue, complained of mucus, /had difficulty with his circulation. The doctor ordered X-rays taken. Both he and a radiologist read the X-rays which revealed "a questionable cardiac enlargement, and some lung scar." A urine test for fluorides was negative. After the October 1968 examination, Dr. Benjamin treated plaintiff regularly for complaints allegedly caused by the operation of defendant's plant.

Dr. Benjamin also treated defendant Margaret Lahman for about 10 years, but it was not until in early 1970 that his examinations went to complaints caused by defendant's plant. Dr. Benjamin testified she complained of "a burning of the mouth, face, eyes, nose and throat, she had headaches, a cough and a feeling of a weight on her chest plus nausea. In addition she had mental stress." An X-ray revealed some scaring at the base of the left lung. A urine test showed a normal fluoride content.

Dr. Benjamin testified that beyond treating his local patients, he had no experience or contact with treating patients suffering from excess inhalation of fluorides, nor had he made any particular study of it. However, at the trial the court and jury were given the benefit of hearing the testimony of a medical expert in the

- 11 -

field of respiratory diseases with particular training and experience in the field of fluorides. The fact they gave little credence to his exhaustive testimony concerning plaintiffs' conditions is hard to believe, and I feel goes to the instructions given by the court on the statute of limitations. I feel that Instruction No. 18 was directly responsible. Too, it is my belief that Instruction No. 19 caused confusion within the jury in considering damages to plaintiffs' real property. In the failure to give plaintiffs' proposed Instruction No. 5, plaintiffs' expert witness Beck's testimony was severely limited.

In Dr. Samuel T. Hubbard of Spokane, Washington, plaintiffs presented to the jury an impeccable witness. His background, training, experience in the medical practice, and reputation as a consultant on air pollution are unquestioned. In the field of fluorides he particularly has practical experience, for his practice and laboratory serve to care for many patients working in the aluminum plant in Spokane. Counsel for plaintiffs sent them to Dr. Hubbard who performed clinical and pathological examinations on both. From these extensive examinations Dr. Hubbard testified that Edward Lahman was 75% medically disabled with a worsening prognosis, all directly or indirectly attributable to the operation of defendant's plant. As to Margaret Lahman, he found that "her diffusion disturbance and lung problem were the result of the inhalation of the contaminated atmosphere."

I recognize that the trial judge was liberal in allowing testimony concerning the entire time of defendant's plant operation in the Garrison area, but find his instructions irreparably damaged plaintiffs' case. The very fact that this jury took but one hour and ten minutes to arrive at its findings, with a case of this import and length of trial, bespeaks of a misunderstanding on the part of the jury as to its functions.

In Hardin v. Olympic Portland Cement Co., 89 Wash. 320, 154 P. 450, the Washington court said:

- 12 -

"No one has a right, however, to pursue a lawful business, if thereby he injures his neighbor * * * without compensating such for the damages actually sustained."

See also:  Sterrett v. Northport Mining & Smelting Co., 30 Wash. 164, 70 P. 266; Bartel v. Ridgefield Lumber Co., 131 Wash. 183, 229 P. 306.

I would reverse the findings and judgment and return the cause to the district court for a new trial.

John Conway Harrison
Associate Justice.