OP 11-0021

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 28

DAVE BURLEY and JEANNIE BURLEY,

Plaintiffs and Petitioners,

v.

BURLINGTON NORTHERN & SANTA FE
RAILWAY COMPANY, a foreign corporation,
f/k/a BURLINGTON NORTHERN RAILROAD
COMPANY, a Delaware Corporation,

Defendants and Respondents.

DIANA AND KENNETH MERIDETH,

Plaintiffs and Petitioners,

v.

BURLINGTON NORTHERN & SANTA FE RAILWAY
COMPANY, a foreign corporation, f/k/a BURLINGTON
NORTHERN RAILROAD COMPANY, a Delaware Corporation,

Defendants and Respondents.

DANA NELSON,

Plaintiff and Petitioner,

v.

BURLINGTON NORTHERN & SANTA FE RAILWAY
COMPANY, a foreign corporation, f/k/a BURLINGTON
NORTHERN RAILROAD COMPANY, a Delaware Corporation,

Defendants and Respondents.

ORIGINAL PROCEEDING:    Certified Question, United States District Court
                        District of Montana

Hon. Richard F Cebull, Presiding Judge

COUNSEL OF RECORD:

For Petitioners:

A. Clifford Edwards (argued); A. Christopher Edwards; Triel D. Culver; Edwards, Frickle & Culver, Billings, Montana

Michael D. Cok (argued), Julieann McGarry, Theodore R. Dunn, Cok Kinzler, PLLP, Bozeman, Montana

For Respondent:

Brooke C. Kuhl (argued); J. Daniel Hoven; Carlo Canty; Browning, Kaleczyc, Berry & Hoven, PC, Helena, Montana

Carl P. Gilmore, K&L Gates LLP, Seattle, Washington

Paul J. Lawrence, Pacifica Law Group LLP, Seattle, Washington

For Amici Curiae:

Hertha L. Lund, Lund Law, PLLC, Bozeman, Montana
(for Montana Farm Bureau Federation)

Patrick M. Sullivan; John P. Davis; T. Lee Bruner; Poore, Roth & Robinson, P.C., Butte, Montana
Mark Staples, Staples Law Firm, P.C., Helena, Montana
(for Montana Mining Association, Montana Petroleum Marketers and Convenience Store Association, Town Pump, Inc., Rocky Mountain Oil, Inc., and Atlantic Richfield Company)

Mark M. Kovacich; Tom L. Lewis; J. David Slovak; Lewis, Slovak, Kovacich & Marr, PC, Great Falls, Montana
(for Livingston Property Owners)

Argued: September 14, 2011
Submitted: September 22, 2011
Decided: February 7, 2012

Filed:

_____
Clerk

2

Justice Brian Morris delivered the Opinion of the Court.

¶1 The United States District Court for the District of Montana certified the following question to this Court:

¶2 *With respect to the continuing tort doctrine, does Montana law, as applied to the facts set forth in Magistrate Judge Ostby's Findings and Recommendations, toll the statute of limitations for property damage claims of nuisance and/or trespass resulting from contamination which has stabilized, continues to migrate, and is not readily or easily abatable?*

¶3 Claims related to property contamination that involve issues of statutes of limitations, continuing torts, and the nature of damages, routinely face resolution in state courts of appeals. These cases often find their way to the state appellate courts through certified questions from federal courts. *See e.g. Hoery v. United States*, 64 P.3d 214 (Colo. 2003); *Bradley v. Am. Smelting & Ref. Co.*, 709 P.2d 782 (Wash. 1985). We address a similar certified question in the instant case.

¶4 We accepted the certified question from the U.S. District Court and now answer the certified question with a qualified yes. We reject the U.S. District Court's formulation that the contamination need be "readily or easily abatable" in order to constitute a continuing tort. Contamination that has stabilized in terms of quantity or concentration, but continues to migrate will toll the statute of limitations until the harm no longer reasonably can be abated. The injury should be classified as permanent once a determination has been made that the nuisance no longer reasonably can be abated. The limitations period begins to run when

3

abatement is not reasonable or complete abatement cannot be achieved, and a permanent injury exists.

FACTUAL AND PROCEDURAL HISTORY

¶5 Burlington Northern & Santa Fe Railway Company (BNSF) and its predecessors operated the Livingston Rail Yard (Yard) in Livingston, Montana, for nearly a century until its closure in 1987. BNSF's operations released hydrocarbons and toxic solvents into the environment surrounding the Yard. These toxic pollutants migrated off the Yard into the groundwater below, onto the soil, and into the air above the neighboring properties.

¶6 The Montana Department of Environmental Quality (DEQ) conducted an investigation and remediation project in accordance with Montana's Comprehensive Environmental Cleanup Responsibility Act ("CECRA"), § 75-10-701 et seq., MCA. BNSF has attempted to remediate some of the pollution through monitored natural attenuation. Monitored natural attenuation involves monitoring the levels of contamination in the groundwater. *Sunburst Sch. Dist. No. 2 v. Texaco, Inc*, 2007 MT 183, ¶ 16, 338 Mont. 259, 165 P.3d 1079. DEQ tested the soil of landowners around the Yard in 1992 and discussed the results with them.

¶7 This present group of claims comprises one of several lawsuits over BNSF's actions in Livingston. The State of Montana, through DEQ, filed federal and state claims in federal district court in 1988. This action included a claim under CECRA. BNSF and DEQ entered into a partial consent decree in 1990. *Mont. v. BNSF*, U.S. District Court, CV 88-141-H-CCL (April 27, 1990). The decree required BNSF to conduct a remedial investigation. The decree did not apply to " 'a claim by a person other than the parties' " to the consent decree.

4

*Mont. Dept. of Envtl. Quality v. BNSF*, 623 F.3d 1312, 1315 (9th Cir. 2010) (quoting Modified Partial Consent Decree).

¶8     A group of landowners and the City of Livingston filed a separate suit in a Montana district court in 2007. The City of Livingston and the landowners sought to recover the costs of restoring the property to its pre-contaminated condition. The U.S. Court of Appeals for the Ninth Circuit recently denied BNSF's attempt to enjoin the suit in federal district court to protect the consent decree. *DEQ*, 623 F.3d at 1316-17.

¶9     Plaintiffs Dave and Jeannie Burley, Dana Nelson, and Diana and Kenneth Merideth (collectively Property Owners) own property adjacent to the Yard. The Property Owners separately sued BNSF in 2007 and 2008 in federal court for damages to their property based on claims of nuisance, negligence, strict liability, trespass, wrongful occupation, unjust enrichment, restoration damages, constructive fraud/misrepresentation, and misconduct in federal court. All of these claims seek damages for contamination that has migrated from the Yard to parcels owned by the Property Owners.

¶10    BNSF filed a motion for summary judgment on the basis that the applicable statute of limitations barred the separate claims filed by Property Owners. U.S. Magistrate Judge Carolyn S. Ostby recommended that the U.S. District Court grant BNSF's motion in an order dated March 2, 2010. The Magistrate Judge found that BNSF's contamination from the Yard had reached the properties at issue decades ago and determined that the claims had accrued by the 1990s. The Magistrate Judge further determined that Property Owners had actual knowledge of the contamination. The Magistrate Judge refused to apply the continuing tort exception. The Property Owners filed objections with the U.S. District Court.

¶11    The U.S. District Court declined to adopt the Magistrate Judge's recommendation of summary judgment. This Court earlier had granted a petition for writ of supervisory control in *Anderson v. BNSF*, No. OP 10-0195. The District Court for the First Judicial District, Lewis and Clark County, had dismissed on statute of limitations grounds a nearly identical claim in *Anderson* as that presented here. The Magistrate Judge found persuasive the reasoning of the state district court in *Anderson* in light of the "strikingly similar" facts and claims as those presented by Property Owners. As a result, the U.S. District Court certified to this Court the question of whether the continuing tort doctrine should apply to the claims presented by Property Owners.

## DISCUSSION

¶12    The U.S. District Court asks how the continuing tort doctrine would apply to a particular scenario with three elements. These three elements include the fact that the pollution has stabilized in terms of concentration levels, that the contamination continues to migrate, and that the parties dispute the ease of abatability of the contamination. We pause briefly to review basic principles of Montana law implicated by the certified question. We first address the contours of nuisance and trespass actions under Montana law. These principles, in turn, guide our application of the statute of limitations analysis.

**Limitations on Actions for Nuisance and Trespass**

¶13    A nuisance action includes "all wrongs which have interfered with the rights of a citizen in the enjoyment of property." *Haugen v. Kottas,* 2001 MT 274, ¶ 15, 307 Mont. 301, 37 P.3d 672; § 27-30-101, MCA. The Court defines a trespass as an intrusion on a party's right to exclusive possession of his property. *Tally Bissell Neighbors, Inc. v. Eyrie Shotgun*

6

*Ranch, LLC*, 2010 MT 63, ¶ 38, 355 Mont. 387, 228 P.3d 1134; *Restatement (Second) of Torts* § 163 cmt. d (1965). A typical trespass or nuisance is complete when committed. The statute of limitations begins to run at that time. 58 Am. Jur. 2d *Nuisances* § 296.

¶14 Montana law recognizes an exception to this general rule. This exception, denominated as the continuing tort doctrine, applies to a temporary injury that gives rise to a new cause of action each time that it repeats. *See Knight v. Missoula*, 252 Mont. 232, 244, 827 P.2d 1270, 1277 (1992). Both nuisance and trespass can constitute a continuing or ongoing tort. *See e.g. Ducham v. Tuma*, 265 Mont. 436, 443, 877 P.2d 1002, 1007 (1994) (discharge of water onto plaintiff's property constituted a continuing trespass); *Nelson v. C&C Plywood Corp.*, 154 Mont. 414, 434, 465 P.2d 314, 325 (1970) (dumping of glue waste constitutes a continuing temporary nuisance). Our references to nuisances in this opinion apply with equal force to trespass claims as well.

¶15 The Court in *Graveley v. Scherping*, 240 Mont. 20, 23, 782 P.2d 371, 373 (1989) (*Graveley I*), applied a general definition of nuisance from American Jurisprudence that seeks to differentiate between a permanent nuisance and a temporary nuisance. The Court quoted extensively from the commentary that describes a nuisance as permanent where "its construction and continuance necessarily result in an injury." 58 Am. Jur. 2d *Nuisances* § 296. The commentary describes a nuisance as temporary when the "injury is not complete" and the injury "depends upon its continuance and uncertain operation of the seasons or of the forces set in motion by it." 58 Am. Jur. 2d *Nuisances* § 296.

¶16 Application of the statute of limitations under Montana law depends, of course, on whether the injury should be classified as temporary or permanent. The Court has observed

7

that statutes of limitation serve the purpose of ensuring "basic fairness" to parties. *E.W. v. D.C.H.*, 231 Mont. 481, 484, 754 P.2d 817, 819 (1988). Statutes of limitations achieve the goal of suppressing stale claims. Injuries to property have a limitations period of two years. Section 27-2-207, MCA.

¶17    A claim does not accrue under Montana law, however, until "the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party." Section 27-2-102(3), MCA. This provision codifies the "discovery rule." The discovery rule applies where the facts constituting the injury by their nature are concealing, or the defendant has taken some action that prevents the injured party from discovering the injury or its causes. Section 27-2-102(3), MCA.

¶18    Precisely when and how to apply the continuing tort doctrine and the discovery rule to cases of property contamination under Montana law gives rise to the certified question. We recognize that this distinction proves difficult to apply. We do not stand alone. One commentator has noted that "[t]here is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.'" *Prosser and Keeton on Torts* 616 (W. Page Keeton, et al. eds., 5th ed., West 1984). This "jungle" proves particularly impenetrable when it comes to the distinction between a permanent nuisance and a temporary nuisance. F. Harper, F. James & O. Gray, *The Law of Torts* § 1.30 (2d ed., Aspen Publishers 1986). We venture intrepidly into the jungle in an effort to provide guidance to the U.S. District Court as we answer the certified question.

**Analysis**

8

¶19     Two divergent theories have evolved with respect to the effect of stabilization, migration, and abatability on the question of whether to toll the statute of limitations. The first theory, supported by BNSF, regards the polluter's cessation of dumping as the triggering event for the running of the limitations period. *See e.g. Village of Milford v. K-H Holding, Corp.*, 390 F.3d 926 (6th Cir. 2004); *LaBauve v. Olin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005); *Achee v. Port Drum Co.*, 197 F.Supp.2d 723 (E.D. Tex. 2002); *McAlister v. Atlantic Richfield Co.*, 662 P.2d 1203 (Kan. 1983). The second theory, urged by Property Owners, looks not to the time of the polluter's cessation of dumping, but to the continued migration of the contamination from a polluter's property. *See e.g. Hoery v. United States*, 64 P.3d 214 (Colo. 2003); *Bradley,* 709 P.2d 782; *Arcade Water Dist. v. United States*, 940 F.2d 1265 (9th Cir. 1991). The Colorado Supreme Court has taken this second approach to an extreme by tolling the statute of limitations until every drop of pollution has been removed from a party's property. *Hoery*, 64 P.3d at 223. We analyze the two theories, and the cases that have developed them, to discern the appropriate approach under Montana law.

**Stabilization**

¶20     The U.S. District Court's certified question asks whether a contamination that has stabilized, but continues to migrate, qualifies as a continuing tort. The Magistrate Judge concluded that the pollution from the Yard had stabilized based on her determination that the overall concentration of pollutants in the underground plume no longer are increasing. This Court has grappled with the distinction between a temporary nuisance and a permanent nuisance in *Nelson*, *Walton v. The City of Bozeman*, 179 Mont. 351, 588 P.2d 518 (1978), *Blasdel v. The Montana Power Company*, 196 Mont. 417, 640 P.2d 889 (1982), *Haugen*

*Trust v. Walker*, 204 Mont. 508, 665 P.2d 1132 (1983), *Shors v. Branch*, 221 Mont. 390, 720 P.2d 329 (1986), *Graveley I*, and *Knight*. BNSF suggests that these decisions provide clear support for its position that the stabilization of the contamination from the Yard bars the application of the continuing tort doctrine. We address each of these cases in an effort to chart the development of Montana law on the effect of stabilization on the question of how to classify a nuisance.

¶21 The concept of an injury having "stabilized" first appears in *Blasdel*. The Court faced the issue of when the limitations period should start to run "in an inverse condemnation case of invasion by underground seep." *Blasdel*, 196 Mont. at 425, 650 P.2d at 894. Water tables in the vicinity of Flathead Lake rose several feet after the Montana Power Company (MPC) constructed Kerr Dam in 1939. Blasdels first complained about damage from the rising water tables in 1941. MPC denied any liability. These problems increased in 1948 and 1957 to the point that Blasdels again raised the issue with MPC. MPC still denied any liability. MPC attributed the rising water tables to increased levels of precipitation in the area. *Blasdel*, 196 Mont. at 420-21, 650 P.2d at 891-92.

¶22 Blasdels finally filed their action for a permanent taking against MPC in 1960. *Blasdel*, 196 Mont. at 421, 650 P.2d at 892. The trial court found MPC liable for the damages caused by the higher water table. The trial court rejected MPC's claim that the statute of limitations barred Blasdels' 1960 complaint. The trial court determined that Blasdels "could not with reasonable certainty ascertain permanent damage" until the growing season of 1959-1960. *Blasdel*, 196 Mont. at 424-25, 650 P.2d at 893-94.

10

¶23 MPC argued on appeal that Blasdels' cause of action for a permanent taking arose in 1941 when they first complained of rising water tables. MPC made no effort in the trial court to prove a date of permanent injury due to its strategy of denying any damage. MPC contended that the Blasdels' cause of action ripened, if it ever did, at the time of their first complaints in 1941. The Court refused to penalize Blasdels for waiting to file its action for a permanent taking until the water table had "stabilized" in 1960, thus making the damage "permanent." *Blasdel*, 196 Mont. at 426, 650 P.2d at 894. The Court instead held that Blasdels' cause of action for a permanent taking did not accrue until the water table had "stabilized" in 1960. *Blasdel,* 196 Mont. at 426, 650 P.2d at 894.

¶24 *Blasdel's* discussion of stabilization comports with the facts of the case: the water table fluctuated in the years following construction of Kerr Dam. It made little sense to require Blasdels to file an inverse condemnation action until they could determine the extent of the taking of their property worked by the rising groundwater tables caused by Kerr Dam. The Court makes no mention of whether the injury in *Blasdel* could be abated in light of the unique factual and legal posture. The rising water table and accompanying harm to Blasdels likely would not recede absent a decision by MPC to remove Kerr Dam. Similarly, Blasdels filed a claim for inverse condemnation. Inverse condemnation by its very nature contemplates a permanent taking of property. *United States v. Clarke*, 445 U.S. 253, 257, 100 S. Ct. 1127, 1130 (1980). Financial compensation provides the sole remedy for a permanent taking of property. *Clarke*, 445 U.S. at 257, 100 S. Ct. at 1130.

¶25 The question of whether a nuisance had "stabilized" likewise emerges in *Haugen Trust*. Warners owned a house in a new subdivision. Warners suffered flooding in their

11

basement in 1978 and 1979. They traced flooding to the water levels in ponds constructed by the developer. Warners partially blocked the flow of water from the ponds during the summers of 1979, 1980, and 1981 by placing a cap across a culvert at the outlet. The obstruction caused the pond water to stagnate and attract mosquitoes. A neighbor removed the culvert cap in response. *Haugen Trust*, 204 Mont. at 510, 665 P.2d at 1134.

¶26    Warners filed a complaint in 1982 against the developer. The developer moved to dismiss Warners' complaint as barred by the two-year statute of limitations. The developer pointed to the fact that Warners had filed the complaint in 1982, but alleged damages only for the years 1978 and 1979. The trial court granted the motion. *Haugen Trust*, 204 Mont. at 511, 665 P.2d at 1134. This Court reversed on the grounds that the damage caused by the flooding had not "stabilized." *Haugen Trust*, 204 Mont. at 513, 665 P.2d at 1135.

¶27    The Court reasoned that Warners' basement continues to flood "periodically" and that the extent of the damage to Warners' basement "varies from occurrence to occurrence." *Haugen Trust*, 204 Mont. at 513, 665 P.2d at 1135. This variance depends on the precise level of the water in the basement and the condition of the basement at the time of each flood. The Court failed to explain the "condition" of the basement, but presumably it refers to the extent to which Warners have finished the basement, what personal items the Warners might have stored in the basement at the time of the next flood, and whether the basement had dried completely since the previous flooding.

¶28    The Court concluded its analysis with discussion of the fact that the nuisance "is apparently abatable" as demonstrated by the effect of the corrective actions taken by Warners to block the water flow into the ponds in 1980 and 1981. *Haugen Trust*, 204 Mont.

12

at 513, 665 P.2d at 1135. The Court once again posed the question of whether a nuisance had "stabilized" in the context of fluctuating groundwater levels. The Court refused to classify the nuisance as permanent when the nuisance had not yet "stabilized." *Haugen Trust*, 204 Mont. at 513, 665 P.2d at 1135. More importantly, the Court relied upon the "apparently abatable" nature of the nuisance to classify it as having a continuing and temporary character. *Haugen Trust*, 204 Mont. at 513, 665 P.2d at 1135.

¶29 Other Montana cases also have seized upon the abatable nature of the nuisance in choosing to classify it as having a continuing and temporary character. For example, a plywood company in *Nelson* converted a saw mill adjacent to Nelsons' property into a plywood manufacturing plant in 1960. The plywood company proceeded to dispose of glue waste through a drainage ditch on its property that eventually emptied into a slough on plaintiffs' property. *Nelson,* 154 Mont. at 416-17, 465 P.3d at 315. Nelsons noticed discoloration and an offensive odor in their well water later that year. *Nelson,* 154 Mont. at 417, 465 P.3d at 315. Tests revealed that Nelsons' water well contained an extremely high level of phenols. *Nelson,* 154 Mont. at 417-18, 465 P.3d at 316. The plywood company denied any responsibility, but dammed the drainage ditch and built a concrete tank to trap the glue waste in 1965. Phenol levels in Nelsons' well water dropped to zero after the plywood company built the tank. Nelsons sued in 1965. *Nelson*, 154 Mont. at 416-17, 465 P.3d at 315-16.

¶30 The jury returned a verdict in plaintiffs' favor. The plywood company argued on appeal that the two-year statute of limitations should have barred plaintiffs' claim. The Court rejected it. The glue waste constituted a continuing temporary nuisance based on the

13

fact that the nuisance caused by the glue waste at all times had been "removable." *Nelson*, 154 Mont. at 434-35, 465 P.3d at 325. In other words, the Court relied on the fact that the plywood company could have abated the nuisance at all times, and, thus, the nuisance created by the glue waste could not be deemed permanent.

¶31 *Walton* determined a nuisance to be of a continuing nature when the City of Bozeman relocated an irrigation ditch and constructed a storm sewer as part of a public works project. The project caused annual flooding of Walton's crops. Walton first complained of the problem in 1967. Severe flooding in 1976 finally prompted Walton to file an action against the City of Bozeman. *Walton*, 179 Mont. at 355, 588 P.2d at 521.

¶32 The City of Bozeman defended on the grounds that any claim by Walton arose upon completion of the project in 1967. The Court noted, however, that Walton claimed damages for his hay crop that traditionally have been classified as "temporary and consequential." *Walton*, 179 Mont. at 355, 588 P.2d at 521. The Court refused to bar Walton's claim based on the running of the limitations period due to the fact that the City "at all times . . . could have abated the nuisance by taking curative action." *Walton*, 179 Mont. at 356, 588 P.2d at 521. The Court failed to define what type of "curative action" would have been required to abate the nuisance. The Court nevertheless declined to classify the nuisance as permanent in light of the fact that the nuisance "was so terminable." *Walton*, 179 Mont. at 356, 588 P.2d at 521.

¶33 In *Shors*, a developer in 1978 placed a locked gate across a road designed to give lot owners access to the Middle Fork of the Flathead River. 221 Mont. at 395-96, 720 P.2d at 242-43. One of the lot owners, Shors, filed an action against the developer in 1982. The

14

developer argued that the two-year statute of limitations barred the claim. *Shors*, 221 Mont. at 396, 720 P.2d at 243. This Court disagreed. The presence of a gate blocking access to a river constituted a continuing tort in light of the fact that the defendants readily could have abated the nuisance by removal of the gate. *Shors*, 221 Mont. at 397, 720 P.2d at 243-44. A new cause of action arose each day that the gate obstructed Shors's free use of his easement. *Shors*, 221 Mont. at 397, 720 P.2d at 244.

¶34    Neighboring landowners in *Graveley I* sought damages for the death of their cattle due to defendants' alleged negligence in allowing lead from ruptured batteries stored on defendants' property to migrate throughout the property. Defendants' house burned to the ground on September 30, 1984. *Graveley I*, 240 Mont. at 21, 782 P.2d at 372. The fire exposed lead batteries stored inside the foundation walls. Graveley Ranch held a grazing lease for the property on which the burned house sat. Graveley Ranch's cattle soon "were looking very bad and were losing weight." *Graveley I*, 240 Mont. at 21, 782 P.2d at 372.

¶35    Graveley Ranch traced these symptoms and the eventual deaths of 27 cows and 11 calves in 1985 and 1986 to the leaking lead batteries. *Graveley I*, 240 Mont. at 21-22, 782 P.2d at 372. Graveley Ranch relied upon a letter dated November 4, 1985, from the Montana Department of Health and Environmental Services that allegedly pinpointed the foundation of defendants' destroyed home as the source of the lead that had poisoned plaintiffs' cattle. *Graveley I*, 240 Mont. at 21, 782 P.2d at 372.

¶36    Graveley Ranch filed an action for damages on October 29, 1987. Defendants raised the statute of limitations as a defense. *Graveley I*, 240 Mont. at 21, 782 P.2d at 372. The trial court refused to toll the limitations period due to Graveley Ranch's knowledge of the

15

actual cause of the injury to their cattle before November 4, 1985. *Graveley I*, 240 Mont. at 22, 782 P.2d at 373. The trial court relied upon a letter from Graveley Ranch's counsel to defendants dated September 25, 1985. The letter cited confirmation from the Department of Health and Environmental Sciences (Department) that the batteries were the source of the lead that had leached through groundwater to vegetation to which Graveley Ranch's cattle had access through the grazing lease. *Graveley I*, 240 Mont. at 22, 782 P.2d at 373.

¶37 This Court reversed. The Court acknowledged that the nuisance had "stabilized" in the sense that defendants had stopped adding to the pile of leaking batteries. The Court concluded, however, that the nuisance continued each day even without the defendants' addition of any more leaking batteries on the plaintiffs' land. *Graveley I,* 240 Mont. at 25, 782 P.2d at 375. The Court thus deemed the nuisance from the leaking batteries to be of a continuous temporary nature in light of the fact that the nuisance "is continuing until it is abated." *Graveley I,* 240 Mont. at 25, 782 P.2d at 375. The Court explained that "[i]f defendants have made no effort to remove the hazardous materials from the fire site, a new cause of action may arise each time a cow becomes ill or dies as a result of lead poisoning." *Graveley I,* 240 Mont. at 25, 782 P.2d at 375.

¶38 BNSF points to the fact that the Court in *Graveley v. Scherping*, 247 Mont. 310, 806 P.2d 29 (*Graveley II*), following remand, affirmed dismissal of plaintiffs' complaint. The Court noted that it had not been made aware that plaintiffs had constructed a fence around defendants' burned out house on October 1, 1985. This fence accomplished the same purpose of removing the batteries – keeping the cattle away from the toxic material. As a result, the limitations period began to run once the nuisance had been abated through the

fence that kept the cattle away from the toxic material. *Graveley II*, 247 Mont. at 312, 806 P.2d at 30.

¶39    Finally, the Court in *Knight* faced the question of whether dust arising from a dirt road constructed in 1957 constituted a temporary nuisance or a permanent nuisance at the time that Knight filed his complaint in 1984. The City of Missoula in 1957 annexed a portion of the land over which Pineridge Drive traversed. *Knight*, 252 Mont. at 237, 827 P.2d at 1272-73. Knight alleged that dust from the dirt road constituted a continuing nuisance that invaded his property each summer. The trial court dismissed the claim based on the fact that the dust from the dirt road constituted a permanent nuisance. The trial court reasoned that Knight's complaint sought to remedy the same problems with the road that he first had raised in 1957. *Knight*, 252 Mont. at 244, 827 P.2d at 1277.

¶40    This Court reversed. The City of Missoula "could have and may readily abate the problems" through a variety of means, including paving the road. *Knight*, 252 Mont. at 245, 827 P.2d at 1278. As a result, the Court deemed the dust from the dirt road to constitute a continuing nuisance. The limitations period would toll "until the nuisance is abated." *Knight*, 252 Mont. at 245, 827 P.2d at 1278. The Court reached this conclusion based upon what it considered to be a similar analysis in *Graveley I* and *Walton*. *Knight*, 252 Mont. at 244-45, 827 P.2d at 1277-78. The Court cited *Graveley I's* discussion of removing the batteries to abate the nuisance. *Knight*, 252 Mont. at 244-45, 827 P.2d at 1277-78. With respect to *Walton*, the Court discussed the fact that the flooding was "terminable by taking curative action." *Knight*, 252 Mont. at 244-45, 827 P.2d at 1277-78.

¶41    We discern one consistent theme in reviewing the historic decisions of this Court that

evaluate whether a nuisance should be classified as temporary or permanent: whether the injury is sufficiently complete to ascertain permanent damages. Alleged "stabilization" of the nuisance, on its own, rarely determines permanency of the injury. *Blasdel* and *Haugen Trust* equate "stabilized" with groundwater tables reaching equipoise following a change in water flows caused by construction of a dam or ponds. In the other cases, however, the nuisance had "stabilized" only in the sense that the nuisance would not abate without some action by the tortfeasor. This action could involve the relatively straightforward act of removing the offending gate in *Shors* or removing the leaking batteries in *Graveley I*. On the other hand, the action could require more strenuous efforts, such as some vaguely defined "curative action" by the City of Bozeman in *Walton* to halt the continued flooding of plaintiffs' crops, the City of Missoula's paving of a dirt road in *Knight*, or the plywood company's construction of a dam and underground storage tank to trap glue waste in *Nelson*. All of the nuisances at issue in these cases would remain, or in other words, be permanent, without some outside action to abate.

¶42     Although the Magistrate Judge did not analyze each of these Montana cases, she relied upon the Ninth Circuit decision, *Montana Pole & Treating Plant v. I.F. Laucks & Co.*, 993 F.2d 676 (9th Cir. 1993), to bar the Property Owners' claims. *Montana Pole*, in turn, relied upon this Court's decision in *Blasdel* for its analysis of whether the contamination at issue constituted a temporary nuisance or a permanent nuisance. 993 F.2d at 680. As we have discussed, however, *Blasdel* derived its determination that the nuisance had "stabilized" from the particular facts of the case. The Court refused to bar the property owners' inverse

18

condemnation action that they had brought more than 20 years after MPC had caused the harm through its construction of Kerr Dam. *Blasdel*, 196 Mont. at 426, 650 P.2d at 894.

¶43    Montana Pole operated a wood treatment plant in Butte, Montana, for nearly a century. *Mont. Pole,* 993 F.2d at 677. Montana Pole used penta, a chemical preservative, which contaminated property on and near the treatment plant. Montana Pole dumped penta into an unlined ditch and allowed two open-air pits to overflow over a period of almost forty years. The penta migrated into nearby Silver Bow Creek. *Mont. Pole*, 993 F.2d at 677.

¶44    The court determined that a polluter cannot contaminate land continuously and then claim that that pollution qualifies as a continuing tort caused by the *manufacturer* of the contaminant. *Mont. Pole*, 993 F.2d at 678. The court rejected Montana Pole's reliance on *Lahman v. Rocky Mountain Phosphate Co.*, 161 Mont. 28, 504 P.2d 271 (1972). Neighboring property owners in *Lahman* complained of noxious smoke emissions emanating from a phosphate manufacturing plant. The defendant phosphate plant took measures to reduce the emissions after receiving complaints. The property owners filed a nuisance action four and a half years after the first emissions. *Lahman*, 161 Mont. at 29-30, 504 P.2d at 272. As noted by the court in *Montana Pole*, the trial court in *Lahman* submitted the cause to the jury to consider damage claims during the two years before Lahman filed suit. *Mont. Pole*, 993 F.2d at 678.

¶45    *Montana Pole* distinguished *Lahman* on three grounds. First, the nuisance in *Lahman* originated on property of the defendant phosphate plant. Second, the nuisance was temporary and recurring. And finally, the nuisance was abatable by the phosphate plant. *Mont. Pole*, 993 F.2d at 678. None of the defendant chemical companies in *Montana Pole*

19

had control over the release of the waste penta. Montana Pole exercised complete control over the use of penta at the treatment plant. The penta did not emanate from property owned or controlled by the defendant chemical companies. Montana Pole dumped the penta on its own property. And the defendant chemical companies could not abate the release of the penta. Only Montana Pole, as exclusive users of the penta, could abate its release. *Mont. Pole*, 993 F.2d at 678.

¶46 *Montana Pole* differs from the instant case in similar ways that the Ninth Circuit deemed significant in distinguishing *Lahman*. BNSF, and BNSF alone, used the chemicals in its operations at the Yard that caused the contamination. Property Owners played no role, either actively or passively, in causing the contamination. BNSF, like Montana Pole, exercised exclusive control over the disposal of the waste. Property Owners again played no role disposing of the contamination from the Yard. Finally, only BNSF could halt the dumping of the chemicals. Property Owners had no hand in BNSF's operations at the Yard. BNSF has directed the attempted remediation of the contamination from the Yard. BNSF proposed monitored natural attenuation to DEQ as the preferred cleanup method. Property Owners have not participated in the remediation. These distinctions render *Montana Pole* of limited relevance in our analysis.

¶47 The Magistrate Judge also pointed to the Ninth Circuit's interpretation of Montana law in *Montana Pole* to justify her reliance on the discovery rule codified at § 27-2-102(3), MCA. The Ninth Circuit affirmed the district court's determination that Montana Pole had known about the pollution years before it filed suit. This knowledge of the pollution potentially implicated the discovery rule. *Mont. Pole*, 993 F.2d at 678. The Ninth Circuit

20

did not deem the discovery rule issue to be dispositive, however, as it proceeded to decide whether a continuing nuisance had taken place. *Mont. Pole*, 993 F.2d at 679. We likewise do not deem the discovery rule dispositive in this case due to the potential application of the continuing tort exception. As discussed further below, the discovery rule definitively would bar a property contamination tort action at the expiration of the limitations period only where the injury had become permanent in the sense that the injury no longer reasonably could be abated, or had abated to a point where permanent damages could be ascertained.

¶48   BNSF further contends that allowing continuing tort claims to apply to stabilized pollution that began well before the statute of limitations period would deny defendants finality. BNSF cites our refusal to toll the statute of limitations in *Montana Petroleum Tank Release Compensation Board v. Federated Service Insurance Co.*, 2008 MT 194, 344 Mont. 45, 185 P.3d 998, to illustrate its point. The Montana Petroleum Tank Release Compensation Board (Board) reimbursed several petroleum facilities for their cleanup expenses after the discovery of oil leaks. *Mont. Petroleum*, ¶ 6. The Board later filed four separate subrogation claims against the facilities' insurers. *Mont. Petroleum*, ¶ 6. The Board waited approximately ten years after it first began making payments to the facilities before it sought reimbursement against the insurers. *Mont. Petroleum*, ¶¶ 7-10. An eight-year statute of limitations applies to contract suits in Montana. *Mont. Petroleum*, ¶ 11; § 27-2-202(1), MCA. The Court determined that "a rule that delays the commencement of the period of limitations until a claim under a contract is made and denied would effectively nullify the purpose of any statute of limitations." *Mont. Petroleum*, ¶ 19.

21

¶49 The background to *Montana Petroleum* and Property Owners' claim both involve the contamination of the property. The similarities end there. *Montana Petroleum* involved a contract dispute between the Board and several insurance companies. *Mont. Petroleum*, ¶ 6. The Board sought a new tolling exception to the limitations period for contract actions. *Mont. Petroleum*, ¶ 16. We declined to recognize a new exception in the context of a contract dispute. *Mont. Petroleum*, ¶ 18.

¶50 No doubt existed that the Board knew about the facts of the contamination, the timing of the release, and the extent of the contamination. The Board advanced the costs associated with the cleanup of the contamination. *Mont. Petroleum*, ¶ 6. The Board inexplicably waited beyond the eight-year statute of limitations for contract actions to seek subrogation from the polluters' insurers. *Mont. Petroleum*, ¶ 16. Here the extent of the contamination from the Yard, the questions of whether the contamination continues to migrate, and whether the contamination can be abated remain hotly debated. The same factors promoting finality in *Montana Petroleum* do not exist.

¶51 The mere fact that the concentration levels of the contamination have "stabilized," without more, fails to support a bar to application of the continuing tort exception to the statute of limitations. Montana cases make clear that stabilization alone does not trigger the running of the limitations period. In fact, the Court in *Haugen Trust* ended its analysis with the discussion of the fact that the nuisance posed by the groundwater "is apparently abatable." 204 Mont. at 513, 665 P.2d at 1135. *Haugen Trust* in no sense stands alone in looking to whether the nuisance at issue can be abated in deciding whether to classify the nuisance as permanent or temporary. *See also Shors* (locked gate posed temporary

22

nuisance); *Graveley I* (leaking lead acid batteries posed temporary nuisance); *Knight* (dusty road posed temporary nuisance). We disagree with BNSF's claim that the alleged stabilization of a nuisance – in the form of pollution concentration levels no longer increasing in the groundwater – provides some sort of bright line rule under Montana law on whether to classify a nuisance as permanent or temporary. We turn then to examine the other two factors posed by the certified question: migration and abatability.

**Migration**

¶52     The Property Owners' expert testified that the soil, water, and bedrock continue to be contaminated by the migrating pollution caused by BNSF. DEQ's 1985 investigation into the Yard required BNSF to examine whether the contamination had the potential to migrate into the groundwater. According to the Magistrate Judge, BNSF began work shortly thereafter to *reduce*, rather than prevent, migrating contamination entering the groundwater. The Magistrate Judge acknowledged the migrating nature of the pollution. The Magistrate Judge deemed immaterial the fact that the pollution continued to migrate, however, based on her determination that the pollution from the Yard was not readily or easily abatable.

¶53     BNSF cites the reasoning of the Sixth Circuit in *Village of Milford* to support its claim that the continuing migration of contamination from the Yard should not toll the limitations period. The plaintiff in *Village of Milford* learned in 1989 that its municipal water supply contained hazardous compounds. 390 F.3d at 930. K-H owned a factory uphill of the town's wells. Waste oil likely had leaked from a dumpster onto K-H's property. The company also had spread waste oil on its grounds. *Village of Milford,* 390 F.3d at 930.

23

¶54    K-H began remedial measures in 1994 and removed the contaminants from the soil at the facility in 1997. *Village of Milford*, 390 F.3d at 931. It also installed a groundwater interdiction system in 1999 to halt contaminants from flowing toward the town. The town sued shortly thereafter. *Village of Milford*, 390 F.3d at 931. A jury found K-H liable for trespass, but the trial court granted judgment notwithstanding the verdict for K-H, based on its determination that the three-year statute of limitations barred the town's claim. *Village of Milford*, 390 F.3d at 931.

¶55    The Sixth Circuit applied Michigan law. The court acknowledged that plaintiffs could receive damages for the limitations period if injured by a continuing tort. *Village of Milford*, 390 F.3d at 933. The court rejected the town's argument, however, that migrating pollution constituted a new cause of action. The town failed to present evidence to suggest that K-H continued to release pollutants after March 1, 1996. *Village of Milford*, 390 F.3d at 933. The court concluded that "the seepage of more water without further acts by the defendant does not constitute an additional tort." *Village of Milford*, 390 F.3d at 933. The three-year statute of limitations under Michigan law barred the town's claim. *Village of Milford*, 390 F.3d at 933.

¶56    The court drew largely upon the permanent tort standard from *Horvath v. Delida*, 540 N.W.2d 760 (Mich. Ct. App. 1995). The court in *Horvath* determined that in a cause of action for flooding, overflow, or seepage that damages property, the cause of action accrues when the land is "visibly damaged." *Horvath*, 540 N.W.2d at 762. The Sixth Circuit relied upon the Michigan standard related to flood damage and applied it to groundwater contamination. *Village of Milford*, 390 F.3d at 933. The court used that definition to

24

determine that "[e]ven if further migration occurred, it was not a new act of trespass." *Village of Milford*, 390 F.3d at 933. *See also Achee,* 197 F.Supp.2d at 729-30 (dismissing claim as time barred when plaintiffs failed to present any evidence that the pollution continued to migrate onto plaintiffs' property); *LaBauve*, 231 F.R.D. at 655-56 (applying Alabama law to determine that a continuous tort requires repetitive acts or ongoing wrongdoing).

¶57 Property Owners urge us to adopt a more flexible standard for pollution that continues to migrate. They point to the Colorado Supreme Court's decision in *Hoery* as a model. There the court answered a certified question from the Tenth Circuit regarding continuing torts. The certified question and factual background closely mirrored that asked by the U.S. District Court in the instant case. The question asked: "[d]oes the ongoing presence of those toxic chemicals on plaintiff's property constitute continuing trespass and/or nuisance under Colorado law?" *Hoery*, 64 P.3d at 215.

¶58 The plaintiffs in *Hoery* bought a residence near Denver with a groundwater well. Pollution from a then shuttered, but previously active, military base had contaminated their well with trichloroethylene. The toxic plume continued to migrate under their property and entered the family's groundwater on a daily basis. *Hoery,* 64 P.3d at 216. The court reasoned that the pollution remained on the plaintiff's property and the pollution continued to migrate daily onto the plaintiff's property. The court determined that any continuing wrongful property invasion constitutes a continuing trespass or nuisance. *Hoery,* 64 P.3d at 223. The court stated, "alleged migration and ongoing presence of toxic chemicals on

25

Hoery's property each constitutes a continuing trespass and nuisance under Colorado law." *Hoery,* 64 P.3d at 216.

¶59     The California courts in *Starrh and Starrh Cotton Growers v. Aera Energy, LLC,* 63 Cal. Rptr. 3d 165, (Cal. 5th App. Dist. 2007), analyzed a similar situation. The plaintiff in *Starrh,* a cotton grower, sued an oil company due to the migration of wastewater produced from the oil company's production activities on its land. The oil company produced 6-9 barrels of wastewater for every barrel of oil. The oil company discharged this highly saline wastewater into unlined percolation ponds. The wastewater subsequently migrated into the aquifer beneath the cotton grower's property. The oil company defended against the claim, in part, by arguing that the trespass had become permanent, and, therefore, barred by the statute of limitations. *Starrh,* 63 Cal. Rptr. 3d at 171.

¶60     The court recognized that whether the trespass "can be discontinued or abated" represented the key distinction between a permanent trespass or nuisance and a continuing trespass or nuisance. *Starrh,* 63 Cal. Rptr. 3d at 173. In this regard, the court rejected the oil company's contention that its construction and initial use of the ponds in the 1950s and 1960s constituted the trespass. The court reasoned that the oil company's wastewater that continues to permeate through the ponds "is the trespass." *Starrh,* 63 Cal. Rptr. 3d at 173. And the harm caused by the trespass can be abated "by some means." These means included the oil company's reduction in its reliance on the ponds to dispose of the wastewater or its complete discontinuance of the practice. Either option would result "in a lessening of the impact on the underlying aquifers." *Starrh,* 63 Cal. Rptr. 3d at 174.

26

¶61 The court further compared the continuing migration of the oil company's wastewater to the initial burial of telephone lines at issue in *Spar v. Pacific Bell,* 1 Cal. Rptr. 2d 480 (Cal. App. 2nd 1991). The court in *Spar* determined that permanent structures, like pipelines, wells, and telephone lines, cannot qualify as a temporary or continuing nuisance. *Spar*, 1 Cal. Rptr. 2d at 484. This distinction between the intentional installation of permanent structures, but on the wrong party's property, and the accidental release of pollution and accompanying unintended migration onto a neighboring party's property, compares favorably with the Colorado court's analysis in *Hoery*. The court in *Spar* further buttressed its permanent nuisance conclusion on the fact that the public utility at issue could have kept the telephone facilities on the property by paying just compensation. 1 Cal. Rptr. 2d at 483. As we noted in *Sunburst,* however, Montana law provides for no express power of eminent domain for polluters and we have declined to find an implied right. *Sunburst*, ¶ 47.

¶62 The *Hoery* court allowed only one exception to its rule regarding continuing torts. This exception involves a continuing property invasion that constitutes a socially beneficial structure—such as a pipeline, an irrigation ditch, or railway line. This type of permanent structure, intentionally built, but inadvertently placed onto a party's property, becomes a permanent tort under Colorado law. *Hoery,* 64 P.3d at 220; *see also Spar*, 1 Cal. Rptr. 2d at 484 (determining that permanent structures could not qualify as continuing temporary nuisances). The court emphasized that Colorado's public policy, by contrast, supports discontinuing "both the continuing migration and the ongoing presence of toxic chemicals" on a party's property. *Hoery*, 64 P.3d at 223.

27

¶63     Washington law likewise provides that a contamination tort "continues until the intruding substance is removed." *Bradley*, 709 P.2d at 791 (Wash. 1985). Particulate matter blew from the smokestacks of a copper smelter for almost one hundred years in *Bradley*. 709 P.2d at 784. Plaintiff owned neighboring land affected by this nearly century-long contamination. Plaintiff brought a nuisance and trespass action against the refinery. *Bradley,* 709 P.2d at 784. The federal district court certified the question to the Washington Supreme Court to determine how the limitations period should apply. *Bradley,* 709 P.2d at 784. The court determined that a continuing trespass or nuisance repeats each day until the refinery removes the offensive substance from the plaintiff's property. *Bradley,* 709 P.2d at 791.

¶64     The Ninth Circuit, applying California law, reached a similar conclusion. The United States government in *Arcade* operated a laundry at an Air Force Base that discharged waste into a neighboring groundwater well. 940 F.2d at 1265. The Ninth Circuit reversed the federal district court dismissal of the water district's claim as time-barred. *Arcade,* 940 F.2d at 1269. The Ninth Circuit determined that "it is [the] leaching of contaminants, not the operation of the laundry, that is relevant in characterizing the nuisance." *Arcade*, 940 F.2d at 1268. The fact that the United States had stopped the operation of the laundry had nothing to do with the continued injury suffered by the plaintiffs. *Arcade,* 940 F.2d at 1269. The Ninth Circuit concluded that "should Arcade prevail, Arcade may bring successive actions for its periodic damages so long as the nuisance continues but remains impermanent." *Arcade,* 940 F.2d at 1269.

28

¶65     BNSF claims that the California Supreme Court later overruled *Arcade* in *Mangini v. Aerojet-General Corp,* 912 P.2d 1220 (Cal. 1996).  Plaintiffs in *Mangini* sued Aerojet, a large industrial manufacturer of solid fuels.  Plaintiffs had acquired a ranch formerly leased by Aerojet.  *Mangini*, 912 P.2d at 1221.  Plaintiffs lacked knowledge of chemical contamination on the land before purchasing it.  *Mangini*, 912 P.2d at 1222.  They acquired notice, however, after the State of California filed two lawsuits concerning the contamination.  Plaintiffs sued Aerojet decades after they found out about the contamination.  *Mangini*, 912 P.2d at 1222.

¶66     The court presented to the jury at trial, as an element of the plaintiffs' cause of action, the question of whether the contamination constituted a continuing nuisance.  The court instructed the jury that plaintiffs had the burden of establishing that the nuisance could be abated.  *Mangini*, 912 P.2d at 1225.  Plaintiffs failed to present evidence regarding the abatability of the contamination on their property, and the jury found for Aerojet due to plaintiffs' failure to establish this element of its claim. *Mangini*, 912 P.2d at 1226.  The California Supreme Court affirmed the verdict.  *Mangini*, 912 P.2d at 1230. The court agreed that "plaintiffs' complete failure to offer substantial evidence of the cost and reasonableness of remediation leads ineluctably to the conclusion that the nuisance at issue is 'permanent' for statute of limitations purposes."  *Mangini*, 912 P.2d at 1223 n. 2.

¶67     We disagree with BNSF's interpretation of *Mangini.*  The court determined that the plaintiffs had failed to present sufficient evidence that the nuisance reasonably could be abated to support their claims of continuing nuisance.  The plaintiffs failed to meet their burden of persuasion in the trial.  *Mangini,* 912 P.2d at 1221.  *Starrh* supports this

29

interpretation: "Our conclusion is consistent with *Mangini*, which did not change existing law. Instead, *Mangini* applied well-established principles to a somewhat unique factual situation and concluded that the only available test—the reasonable-abatement test—had not been proven." *Starrh,* 63 Cal. Rptr. 3d at 173. The California court in *Mangini* did not modify application of the continuing tort doctrine discussed in *Arcade*.

¶68    We face a choice between the two camps into which current law pertaining to migrating property contamination falls. The first group, occupied by Colorado's *Hoery,* California's *Starrh*, Washington's *Bradley,* and the Ninth Circuit's *Arcade,* considers migrating property contamination to constitute a continuing temporary tort. Each entry of pollution onto a party's property caused by its migration constitutes a new cause of action. The second viewpoint, as expressed by the Sixth Circuit in *Village of Milford* and the Michigan court in *Horvath*, considers the defendant's actions, and not the further movement of the defendant's pollution. The statute of limitations begins to run once the defendant ceases to act.

¶69    *Graveley I* supports the notion that a tortfeasor need not add to the nuisance for it to be classified as continuing. The Court determined that the nuisance continued each day even without the defendant's addition of more leaking batteries. *Graveley I,* 240 Mont. at 25, 782 P.2d at 375. Not all of the Montana nuisance cases that we have discussed herein, however, address directly the effect of the continuing migration of a nuisance on the question of whether to classify the nuisance as temporary or permanent.

¶70    For example, the gate in *Shors* involved a permanent structure that did not move. The Court nevertheless classified the nuisance as temporary due to the fact that the developer

30

could have removed the gate to abate the nuisance. *Shors*, 221 Mont. at 397, 720 P.2d at 243-44. Likewise the dust at issue in *Knight* annually blew onto Knight's property during the summer months. This fact played little role in the Court's determination that the nuisance was of a continuing and temporary nature. The Court instead focused on the fact that the City of Missoula could abate the nuisance. *Knight*, 252 Mont. at 245, 827 P.2d at 1278.

¶71    Many of the other cases, however, involved the migration of water, *Walton*, 179 Mont. at 355, 588 P.2d at 521 (stormwater run-off due to reconfiguration of drainage ditch), *Blasdel*, 196 Mont. at 421, 650 P.2d at 892 (rising water table caused by Kerr Dam), and *Haugen Trust*, 204 Mont. at 513, 665 P.2d at 1135 (rising groundwater from newly constructed ponds), or the migration of water contaminated with some pollutant, *Nelson*, 154 Mont. at 417, 465 P.2d at 315 (wastewater contaminated with glue waste infiltrating well water) and *Graveley I*, 240 Mont. at 25, 782 P.2d at 375 (battery acid transported through groundwater). With the exception of *Blasdel*, the Court classified each nuisance as continuing and temporary until abated. The Court further noted in each instance that the nuisance could be abated through some sort of "curative action." *See e.g. Walton*, 179 Mont. at 355, 588 P.2d at 521 (City of Bozeman at all times could have taken "curative action"); *Haugen Trust*, 204 Mont. at 513, 665 P.2d at 1135 (culvert cap temporarily had solved the problem). The rising water table in *Blasdel* obviously could not be abated. The Court declined to label the tort as permanent and thereby trigger the running of the statute of limitations, however, until the water table had "stabilized." *Blasdel*, 196 Mont. at 426, 650 P.2d at 894.

31

¶72 We similarly decline to follow the reasoning that once the tortfeasor has stopped adding to the nuisance the injury should be deemed permanent. MPC constructed Kerr Dam in 1939. It took no further steps to cause an increase in the water table. This Court nevertheless determined that the injury in the form of the rising water table triggered by the 1939 construction of Kerr Dam had not "stabilized" and thereby become a permanent injury until 1960. *Blasdel*, 196 Mont. at 426, 650 P.2d at 894. The landowner in *Graveley I* and *II* added no more leaking batteries to the pile stored in the burned out foundation exposed by the 1984 fire. The nuisance retained its continuing and temporary character until the plaintiffs abated the nuisance by fencing their cattle out of the affected area in 1985. *Graveley II*, 247 Mont. at 312, 806 P.2d at 30-31. Likewise the City of Bozeman in *Walton*, 179 Mont. at 355, 588 P.2d at 521, the City of Missoula in *Knight*, 252 Mont. at 245, 827 P.2d at 1278, and the developer in *Haugen Trust*, 204 Mont. at 513-14, 665 P.2d at 1135, undertook no further actions related to the nuisance following the completion of their various construction projects. The Court in all three cases nevertheless focused on the continuing effect of the tortfeasors' conduct rather than on the initial creation of the nuisance.

¶73 The reasoning and outcomes of these Montana cases leads us to conclude, as further explained below, that a nuisance of a continuing temporary nature includes migrating pollution. A defendant's *failure* to stop the continuing migration of a nuisance onto a plaintiff's property, where it reasonably can be stopped, constitutes a continuing property invasion. *Hoery*, 64 P.3d at 222. We decline to adopt the Sixth Circuit's reasoning in *Village of Milford*. 390 F.3d at 933. The migrating pollution in the instant case, though stabilized in terms of concentration levels, fits Montana's historical definition of a

continuing temporary injury. To classify as permanent a nuisance that continues to migrate could bar a plaintiff from bringing a nuisance action, even if the contamination from a defendant's tortious actions continues to affect different parts of her land each day. *Haugen Trust*, 204 Mont. at 513, 554 P.2d at 1135. The fact that a nuisance continues to migrate constitutes an important factor under Montana law in evaluating whether the pollution should be treated as a continuing trespass or nuisance. *Graveley I*, 240 Mont. at 25, 782 P.2d at 375.

**Abatability**

¶74    We turn, finally, to the king of our nuisance jungle: whether the degree of difficulty to abate a nuisance should determine whether to classify the nuisance as temporary or permanent. This question looms large over our analysis. The fact that the nuisance at issue could be abated in some fashion permeates this Court's historical nuisance cases. The "curative action" by the City of Bozeman to stop the stormwater run-off from flooding the property owner's field in *Walton* and the culvert cap used in *Haugen Trust* to solve temporarily the basement flooding caused by the construction of ponds at a new subdivision serve as prime examples. The Court in both instances relied upon the fact that both nuisances could be abated to classify the nuisances at issue as continuing and temporary. *Walton*, 179 Mont. at 355, 588 P.2d at 521; *Haugen Trust*, 204 Mont. at 513, 665 P.2d at 1135.

¶75    The U.S. District Court posited the "readily or easily abatable" standard to evaluate whether a tort qualifies as permanent or temporary under Montana law. Pursuant to the court's formulation, a nuisance or trespass that takes a long time to clean up, or would entail great expense, would not be classified as readily or easily abatable, and, therefore, would be

33

deemed permanent. BNSF expert reports indicate that the future migration of the contamination onto the Property Owners' parcels could be contained. They further indicate, however, that the contamination level may never be able to reach zero. BNSF equates the Yard site to the situation faced by the Kansas Supreme Court in *McAlister*.

¶76 There a farmer sued for temporary damages to his water well caused by the defendant's oil fields. The farmer alleged "that not less than 150 nor more than 400 years will pass before the well water will be fit for drinking." *McAlister*, 662 P.2d at 1212. The farmer provided no indication that the pollution could be abated and the defendants had discontinued oil well operations in the 1940s. The court determined that under these circumstances the injury had become "fixed" and "the property will always remain subject to that injury." *McAlister*, 662 P.2d at 1212.

¶77 The Tenth Circuit distinguished *McAlister* in *Miller v. Cudahy Co.*, 858 F.2d 1449 (10th Cir. 1988). Both cases applied Kansas law. The neighboring farmers in *Miller* alleged that salt mining by Cudahy Co. had caused the pollution of an underground aquifer that flowed under their farms. The pollution allegedly prevented the farmers from using water in the aquifer to irrigate their crops. The trial court determined that the pollution emanating from the salt plant constituted a continuing, abatable nuisance that caused temporary damages. The trial court found Cudahy Co. liable for $3.06 million in actual damages and $10 million in punitive damages. *Miller*, 858 F.2d at 1451.

¶78 The Tenth Circuit rejected Cudahy Co.'s attempt to analogize its defense to the one adopted by the court in *McAlister*. Cudahy Co. admitted to having polluted the aquifer and claimed that the pollution would last indefinitely. The Tenth Circuit recognized, however,

34

that "the cleanup process can be accelerated by intervention measures" and could be achieved within a reasonable time. *Miller*, 858 F.2d at 1455.

¶79    Property Owners contend that BNSF's preferred choice of remediation—monitored natural attenuation—distorts the length of time that it will take to abate the harm from the Yard, and, correspondingly, distorts the Magistrate Judge's determination that their injuries from the Yard cannot be deemed temporary. Property Owners further allege that the abatability time drastically will reduce if the federal court requires BNSF to apply a more aggressive abatement technique. They acknowledge that a more aggressive technique would be more expensive for BNSF. The trier of fact must weigh these factors to determine whether a nuisance could be abated. We reach again the question of the degree of difficulty required to abate the nuisance.

¶80    The U.S. District Court derived the "readily abatable" standard from the Court's decision in *Graveley I*. 240 Mont. 20, 782 P.2d 371. *Graveley I* and other Montana cases that have discussed readily or easily abatable nuisances used that language more to describe the facts of those cases than to establish a standard. The Court in *Graveley I* determined that the harm in the form of the leaking batteries "could have been readily abated" simply by removing the ruptured batteries and cleaning the foundation walls. *Graveley I*, 240 Mont. at 24, 782 P.2d at 374. The Court did not define the parameters of Montana law with respect to the distinction between temporary and permanent injuries. The Court described the ease with which the defendants could have abated their nuisance as a factor in classifying the injury as temporary in nature.

35

¶81 The U.S. District Court similarly applied the "easily abatable" language from *Shors*. Removal of the gate represented an obvious and simple solution to abating that injury. *Shors*, 221 Mont. at 397, 720 P.2d at 243-44. The Court's choice of words, "easily abated," once again described the facts of that case. Our other cases that have addressed continuing nuisances have not used the words "readily" or "easily" when describing the abatement standard. For example, the Court in *Walton* noted that "the City could have abated the nuisance by taking curative action." 179 Mont. at 356, 588 P.2d at 521. The Court failed to identify the type of "curative action" and the Court failed to categorize the ease of abatability.

¶82 *Haugen Trust* likewise rejected the notion that the injury could be classified as a permanent nuisance on the grounds that "the nuisance is apparently abatable." 204 Mont. at 513, 665 P.2d at 1135. The Court did not specify how "apparent" the abatability must be. The Court simply repeated the well-accepted rule that the nuisance must be abatable in order to constitute a continuing tort. *Haugen Trust*, 204 Mont. at 514, 665 P.2d at 1135. We agree with the Property Owners that "readily or easily abatable" fails to capture the parameters of a continuing tort under Montana law.

¶83 *Restatement (Second) of Torts* defines an "abatable physical condition" as an abatement that could "be accomplished without unreasonable hardship or expense." *Restatement (Second) of Torts* § 839 cmt. f (1979); *Mangini*, 912 P.2d at 1227. Similarly, the court in *Spaulding v. Cameron*, 239 P.2d 625 (Cal. 1952), recognized that "abatable" means reasonably abatable. This concept of "reasonably abatable" resonated with the court in *Mangini* more than four decades later. *Mangini* made clear that a nuisance must be

36

regarded as permanent and the plaintiff relegated to a single cause of action and a single limitations period where as a practical matter abatement would be "inappropriate or unfair." *Mangini*, 912 P.2d at 1228.

¶84     This Court has adopted the measure of damages for a temporary injury to property from the *Restatement (Second) of Torts*. *Restatement (Second) of Torts* § 929(1) (1979); *Lampi,* ¶ 32. An injury qualifies as temporary if the "tortfeasor could restore the destroyed property to substantially the condition in which it existed before the injury." *Lampi,* ¶ 32; *Sunburst,* ¶ 31. We have adopted other sections of *Restatement (Second) of Torts*. *See e.g. Sunburst,* ¶ 36 (adopting § 929 for calculating damages to real property); *Crisafulli v. Bass,* 2001 MT 316, ¶ 23, 308 Mont. 40, 38 P.3d 842 (adopting § 316, imposing liability on a parent for acts of a child); *Brandenburger v. Toyota Motor Sales USA Inc.,* 162 Mont. 506, 513 P.2d 268 (1973) (adopting § 402(A), imposing strict liability on defective product sellers).

¶85     American Jurisprudence's reasonableness standard for abatement of continuing nuisances similarly provides that a nuisance continues "if abatement is reasonably and practicably possible or where it is abatable at a reasonable cost." 58 Am. Jur. 2d *Nuisances* § 27. We have adopted other sections of American Jurisprudence related to nuisance claims. *See e.g. Haugen,* ¶ 15 (adopting § 1 to define nuisance in Montana); *Wilhelm v. Great Falls,* 225 Mont. 251, 256, 732 P.2d 1315, 1318 (1987) (adopting § 221 to establish that contributory negligence can be a defense in a nuisance action).

¶86     Other jurisdictions have applied a reasonably abatable standard. The court in *Beck Development Co. v. Southern Pacific Transportation Co.* used a multi-factor analysis to

determine whether the oil pollution could be abated at a " 'reasonable cost by reasonable means.' " 52 Cal. Rptr. 2d 518, 559 (Cal. 3rd App. Dist. 1996) (quoting *Mangini*, 912 P.2d at 281). The California court constructed "fundamental considerations" to apply to the reasonableness of abating a nuisance. These considerations included feasibility, alternatives to abatement, the cost and time involved, competing interests, and a cost-benefit analysis of abatement. *Beck*, 52 Cal. Rptr. 2d at 559-60.

¶87 Another California court, in *Starrh*, described the possibility of abatement as a standard in which "it must be possible to clean up the toxic materials without unreasonable hardship or expense." 63 Cal. Rptr. 3d at 172. The court discussed the "evolving tension between economic interests and environmental protection." *Starrh,* 63 Cal. Rptr. 3d at 174. This Court in *Sunburst* recognized these tensions when it declined to cap restoration damages at the market value of the property: "[a] potential tortfeasor would have an incentive to disregard or discount risks of contamination or pollution to neighboring property owners." *Sunburst*, ¶ 46. BNSF urges this Court to set, in effect, a similar limit on a polluter's liability by requiring remediation only if the harm could be abated easily or readily.

¶88 We agree that " 'little or no incentive to make remedial efforts' " would exist once a court classifies a nuisance as permanent. *Starrh*, 63 Cal. Rptr. 3d at 174 (quoting *Baker v. Burbank-Glendale-Pasadena Airport Auth.*, 705 P.2d 866, 872 (Cal. 1985)). This ability for a tortfeasor to avoid remedying a plaintiff's harm due to a court deeming an injury permanent, rather than temporary, conflicts with the overriding philosophy of tort law. The reasonably abatable standard, by contrast, comports with the general standards of tort law.

38

Tort law seeks to "put an injured person in a position as nearly as possible equivalent to his position prior to the tort." *Restatement (Second) of Torts* § 901 cmt. a (1979); *Lampi*, ¶ 21; *Sunburst*, ¶ 32. A defendant's abatement of property damage substantially would restore the plaintiff's property back to the condition in which it existed before the injury. *Restatement (Second) of Torts* § 929(1) (1979). This reasonable abatement standard further accomplishes the companion goal of bringing finality to a dispute for purposes of the statute of limitations. *Linder v. Missoula Co.*, 251 Mont. 292, 298, 824 P.2d 1004, 1007 (1992).

¶89    We adopt the reasonably abatable standard for continuing torts as announced in *Restatement (Second) of Torts* § 839. The ease with which a tortfeasor could abate the harm represents merely one element to consider. Courts should evaluate whether it would be reasonable for the tortfeasor to abate the harm taking into account all factors, including the ease with which the harm could be abated. Other factors include the cost of the abatement, the type of property affected, the severity of contamination, and the length of time necessary to remediate such pollution. *See Beck*, 52 Cal. Rptr. at 559-60.

¶90    The reasonableness test for an abatable nuisance accords with this Court's decision in *Burk Ranches v. State of Montana*, 242 Mont. 300, 790 P.2d 443 (1990). The Court determined that potential abatement must "be an actual possibility within reasonable capabilities of the parties." *Burk Ranches,* 242 Mont. at 306-07, 790 P.2d at 447. The words "actual possibility" imply a reasonableness standard. More importantly, the Court recognized the "reasonable" capabilities of the parties. Although *Burk Ranches* addressed the appropriate measure of damages, the reasonableness standard that the Court espoused also applies to potential abatement.

39

¶91    The trier of fact must determine whether the cost of abatement would be reasonable under the circumstances. Reasonableness generally presents a question of fact for the trier of fact to weigh the evidence and judge the credibility of the witnesses. *Dean v. Austin Mut. Ins. Co.*, 263 Mont. 386, 389, 869 P.2d 256, 258 (1994). None of the insurance related exceptions, *Redies v. Attorneys Liability Protection Society*, 2007 MT 9, ¶¶ 32-33, 335 Mont. 233, 150 P.3d 930, apply to the question of the reasonableness of a proposed   abatement. This reasonableness question must be decided by the trier of fact.

¶92    We recognize the potential inconvenience to a district court of having the jury resolve factual disputes that implicate a potentially dispositive statute of limitations affirmative defense. A district court may be required to hold in abeyance any ruling on the statute of limitations affirmative defense until the jury first determines whether the nuisance reasonably can be abated and thereby the nuisance qualifies as a continuing tort. The court would address whether the limitations period had run only if the plaintiff fails to establish the elements of a continuing tort, as determined by the jury, and corresponding tolling of the limitations period.

¶93    This process imposes no novel or unique burden. In fact, the tolling provisions contained in § 27-2-102(3), MCA, support this approach. As we noted in *Blackburn v. Blue Mountain Women's Clinic*, 286 Mont. 60, 951 P.2d 1 (1997), the self-concealing nature of a claim could trigger the tolling provision of § 27-2-102(3), MCA. There a patient alleged that a medical clinic had failed to disclose the risks of abortion and had failed to reveal the truth about the transmission of HIV. The district court dismissed the claim based on the running of the three-year negligence statute of limitations. This Court reinstated the patient's

40

negligence claim to allow the patient the opportunity to demonstrate to the jury that "she exercised due diligence sufficient to trigger the tolling provision of § 27-2-102(3), MCA." *Blackburn*, 286 Mont. at 79-80, 951 P.2d at 34-35.

¶94     We likewise addressed in *Textana, Inc. v. Klabzaba Oil & Gas*, 2009 MT 401, 353 Mont. 442, 222 P.3d 580, the interplay between a claim of fraudulent concealment and a statute of limitations affirmative defense. Klabzaba's counterclaim alleged breach of contract. Textana, Inc. raised a statute of limitations affirmative defense. Klabzaba alleged that Textana Inc.'s fraudulent concealment had prevented it from discovering the breach of contract claim. *Textana*, ¶¶ 24-25. The district court determined that the question of when Klabzaba discovered the alleged breach of contract should be submitted to the jury in light of the existence of sufficient facts to raise a question of fraudulent concealment. *Textana*, ¶ 36. We affirmed. We agreed with the district court that the record revealed sufficient evidence of potential fraudulent concealment to support the district court's decision to send the statute of limitations question to the jury. *Textana*, ¶ 40. *See also Fasch v. Weeden Constr.*, 2011 MT 258, 362 Mont. 256, 262 P.2d 1117 (determining that the district court improperly had resolved factual disputes that should have gone to the jury in order to reach the legal question of whether the defendant owed a duty of care to the plaintiff).

¶95     A plaintiff would have to establish sufficient evidence of the potential reasonableness of the proposed abatement to send the statute of limitations question to the jury. The district court retains the ability to grant summary judgment where the plaintiff fails to establish a genuine issue of fact. Although a plaintiff may be able to clear this threshold in many cases, *Mangini* illustrates that the plaintiff will not always meet this burden. 912 P.2d at 1226. A

41

district court retains the discretion to administer its docket in the most efficient manner through the use of pretrial hearings, special verdict forms, or other mechanisms contemplated by M. R. Civ. P. 16.

¶96    BNSF poses one final obstacle on the path out of our nuisance jungle. BNSF argues that the nuisance must be abatable completely in order to qualify as temporary. We disagree. The *Starrh* court and other jurisdictions have recognized that even abating harm "by some means" would lessen the injury to plaintiffs. *Starrh*, 63 Cal. Rptr. 3d at 174. *Mangini* accepted the general proposition that "something less than total decontamination may suffice to show abatability." *Mangini*, 912 P.2d at 1226.

¶97    The D.C. Circuit in *Beatty v. Washington Metropolitan Area Transit Authority (WMATA),* 860 F.2d 1117, 1124 (D.C. Cir. 1988), likewise determined that a nuisance is abatable if it can be reduced. Vibrations emanating from subway trains operated by WMATA caused damage to plaintiff's house situated 65-80 feet away from the tracks. *Beatty*, 850 F.2d at 1119. WMATA countered that the subway system constituted a permanent nuisance. *Beatty*, 850 F.2d at 1120. The court concluded that evidence presented by plaintiff showed that the WMATA indeed could dampen the vibrations. The court also determined that genuine issues of material fact existed as to whether the nuisance was permanent or continuing. *Beatty*, 850 F.2d at 1122.

¶98    We disagree with BNSF that abatement of an injury represents an all or nothing proposition. Black's Law Dictionary defines "abatement" as "[a] reduction, a decrease, or a diminution." *Black's Law Dictionary* 15 (4th ed., West 1968). An abatable nuisance does not have to be capable of complete eradication. As we have recognized, a defendant's

42

abatement of property damage substantially would restore the plaintiff's property back to the condition in which it existed before the injury. *Restatement (Second) of Torts* § 929(1) (1979). We do not require complete restoration. We agree with the D.C. Circuit that to equate abatability only to nuisances that can be removed entirely "does violence to the law of nuisance." *Beatty,* 860 F.2d at 1124. A tortfeasor should not avoid liability for his contamination simply because his misdeeds cannot be undone completely. The degree of abatement determines instead whether permanent damages can be ascertained. When no further abatement is reasonable, the injury is complete, and the injury is permanent. The trier of fact must consider whether the reduction or decrease in the nuisance would be reasonable based on the same factors that we earlier have discussed, ¶ 89, regarding abatability.

CONCLUSION

¶99    We close with one final effort to trace the contours of the proper application of the continuing tort doctrine under Montana law. Contamination that has stabilized in terms of quantity or concentration, but continues to migrate, will toll the statute of limitations until the harm no longer reasonably can be abated. Once a determination has been made that the nuisance no longer reasonably is abatable, however, the injury should be classified as permanent. Under those circumstances, a plaintiff would be required to bring an action within the limitations period when the plaintiff knows, or reasonably should know, of a permanent injury.

¶100   This reasonably abatable standard for continuing torts follows the theory behind nuisance and trespass law in Montana and further promotes the principle that tort law seeks to restore the injured party as closely as possible to the injured party's pre-tort position.

43

*Restatement (Second) of Torts* § 901 cmt. a (1979); *Lampi,* ¶ 21; *Sunburst,* ¶ 32. A tortfeasor who impairs the property rights of another should not prevail simply because its pollution or interference with another's property takes a lengthy amount of time or a large amount of money to abate. The trier of fact must determine whether further abatement would be reasonable under the evidence presented. This formulation balances the need for finality with a tortfeasor's obligation to restore substantially the injured party to his pre-tort position. *Lampi,* ¶ 32.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JIM RICE
/S/ BLAIR JONES
District Court Judge Blair Jones sitting
for Justice Michael E Wheat

44