

DA 12-0405

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 179

GREG JOHNSTON, ELVIRA JOHNSTON,
ELVIRA JOHNSTON TRUST,

      Plaintiffs, Appellants and Cross-Appellees,

    v.

CENTENNIAL LOG HOMES &
FURNISHINGS, INC., RANDY TOAVS,
JOSH HARMON,

      Defendants, Appellees and Cross-Appellants.

APPEAL FROM:    District Court of the Twentieth Judicial District,
                 In and For the County of Lake, Cause No. DV 09-322
                 Honorable C.B. McNeil, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

           P. Bradford Condra; Milodragovich, Dale & Steinbrenner, P.C.;
           Missoula, Montana

      For Appellees:

           Todd A. Hammer, Angela K. Jacobs; Hammer, Hewitt, Jacobs & Quinn,
           PLLC; Kalispell, Montana

                    Submitted on Briefs:  March 6, 2013

                               Decided:   July 8, 2013

Filed:

                          _____
                                    Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    Greg and Elvira Johnston and the Elvira Johnston Trust appeal an order of the Twentieth Judicial District Court, Lake County, granting summary judgment to Centennial Log Homes & Furnishings, Inc. (Centennial) on the Johnstons' claims for negligence, breach of warranty and violations of the Montana Consumer Protection Act and Unfair Trade Practices Act.  We consider the following issues on appeal:

¶2    1. *Whether the District Court erred in concluding as a matter of law that the Johnstons' claims are barred by the applicable statutes of limitations.*

¶3    2. *Whether the District Court erred in determining that the release executed by the Leonards is binding on the Johnstons.*

¶4    3. *Whether the District Court abused its discretion in granting the Johnstons' motion to dismiss Keeko Log Homes, Ltd. as a defendant.*

¶5    We reverse in part and remand the case for further proceedings.

## PROCEDURAL AND FACTUAL BACKGROUND

¶6    In 2001, Robert and Sandy Leonard purchased property in Bigfork, Montana.  That same year, the Leonards entered into contracts with Centennial for the sale of a log home kit and construction of a custom log home on the property.  After completion of the home—a three story residence with a loft floor and daylight basement—the Leonards moved in.  By grant deed dated July 1, 2002, the Leonards granted 36% of the interest in the property to the Johnstons, who are Sandy Leonard's parents.

¶7    In October or November, 2002, the Leonards observed that their wood floors had begun to "bubble," heave and raise, and they discovered extensive mold underneath the flooring.  The Leonards discussed these problems with the Johnstons and Greg Johnston

suggested that the Leonards hire an attorney. In an e-mail to the Leonards, Greg Johnston stated, "since I own 34% [sic] of the house, I could have a lawyer friend write a letter also to instill into Centennial that we mean business." The Leonards hired Peter Leander to represent them and began to meet with him. The Johnstons did not attend those meetings. On December 16, 2002, Leander wrote a letter to Centennial's counsel that provided a "non-inclusive" list of additional problems with the home, such as cracked tile grout in two bathrooms, a broken shower light, a missing soap dish, stairs that were not to code, and the splitting apart of the corner of the office wall. Sandy Leonard recalled during her May 6, 2011 deposition that she considered the items on this list to be "some minor things."

¶8 On April 10, 2003, the Leonards executed a "General Release" in favor of Centennial, describing the Leonards' "casualty" as:

> Defective construction of log home in Sunset Heights, Woods Bay, Lake County, Montana; mold infestation and eradication due to defective construction; bodily injury claims due to mold infestation.

The Leonards released Centennial from "any and all" claims for damages, "asserted or unasserted, known or unknown, foreseen or unforeseen, arising out of the described casualty" and, as consideration, Centennial paid $6,000 to the Leonards, extinguished the remaining $59,704.13 due on their construction contract, and released the construction lien on the property. The release covered "all claims for defective construction or warranty arising out of the construction of the premises described above." The release also covered future damages associated with the Leonards' casualty:

3

Inasmuch as the damages and losses resulting from the events described herein may not be fully known and may be more numerous or more serious than it is now understood or expected, the Releasors agree, as further consideration of this agreement, that this Release applies to any and all injuries, damages and losses resulting from the casualty described herein, even though now unanticipated, unexpected and unknown, as well as any and all injuries, damages and losses which have already developed and which are now known or anticipated.

The Leonards, Centennial and all of Centennial's subcontractors were parties to the release. The Johnstons were not parties, though they held a 36% interest in the property at the time the release was signed.

¶9 On March 31, 2004, the Johnstons granted their 36% interest to the Elvira M. Johnston Trust (Johnston Trust). The following year, on April 5, 2005, the Leonards granted their 64% interest in the property to the Johnston Trust.

¶10 In 2004 and 2005, the Johnstons employed Innovative Builders to conduct routine maintenance of the log home. Innovative Builders provided a "punch-list" of repairs to be performed, which included leveling of the home, chinking and staining the exterior logs, repairing the exterior railing and stairway, repairing exterior rock around a post, and replacing a structure beam on the deck in front of the south garage. The Johnstons paid Innovative Builders approximately $50,000 to repair stairs, decks, and problems with settling of the logs.

¶11 The Leonards moved out in 2005 and the home was used as a rental. In 2007, James Johnson and his wife began renting the home. In the spring of 2008, the Johnsons observed that the logs within the home had begun to split in an unusual manner. Johnson, who had worked extensively in the construction and architectural design industries,

4

documented the progression of each occurrence. He observed that "the main support for the roof above the loft was twisting due to the shrinking and splitting of the surrounding support members" and determined that intervention was needed.

¶12     In April 2008, Guy Clare of Rocky Mountain Design inspected the home due to the excessive log cracking and post and beam movement in the loft area. He noted:

> . . . cracked and rotting handrails on the outside deck, and major exterior siding problems. The majority of the "cedar skirl" siding on the upper level of the home had begun to peel away from the wall from lack of proper fastening. The exterior stair posts had been set at ground level and moisture had begun to rot the lower section of each post.

Clare advised the Johnstons to hire a structural engineer "because of the severity of the log splitting and structural movement of the log roof beams located at the upper loft."

¶13     John Thomas of A2Z Engineering performed site visits on May 7, 2008 and May 21, 2008 to evaluate the home's structural integrity and the impact of extensive checking on its structural performance. His report explained that "[l]og homes are inherently prone to maintenance, settlement, and checking issues. However, with proper construction techniques the impact of these issues can be greatly mitigated." He outlined steps that generally are taken in the harvesting and drying of logs to mitigate checking—the splits in logs as they dry and shrink over time, which, Thomas described, "extend radially from the center of the log and widen as they approach the log's exterior"—and concluded that these techniques likely had not been employed in construction of this home. Thomas noted that, according to the homeowners and tenants, significant interior checking had not occurred until the spring of 2008. He also noted that, between his May 7, 2008 and

May 21, 2008 visits, the checking had become "significantly more advanced." He concluded that the logs had likely been sealed in a moist or "green" condition, which was consistent with delayed onset and rapid acceleration of the wood checking:

> During my site visit I observed significant checking of the majority of beam and column logs in the residence. The fact that this checking has occurred 6 years after the construction of the home suggests to me that the logs were processed and sealed in a moist or "green" condition. Because the logs were heavily sealed it would take a much longer time for the log to lose enough moisture to initiate checking. However, once checking began the log would then have an avenue to rapidly lose moisture through the check and further drying would then proceed rapidly. . . . Homeowner testimony of the windows breaking/jamming and multiple large screw jack adjustments add to the likelihood that high moisture content material was used.

According to Thomas, there was no way to ascertain the moisture content of the logs if moisture samples were not taken at the time of construction. He discovered additional problems, including several connections along the ridge beam of the structure which were not code compliant, an intermediate valley support that appeared to push toward the ridge beam, creating potential for large roof deflections and failure of the roof under snow loads, and an inadequate header above the garage door, creating risk of significant structural collapse.

¶14 Based on Thomas's recommendations, Clare of Rocky Mountain Design estimated the total repair cost to be $125,000, but clarified that the estimate pertained only to the "current problems that can be seen as of this writing." He noted again that there had been "significant changes" to the interior logs of the home since his first visit in April 2008.

6

¶15    In October 2008, A2Z Engineering conducted another structural evaluation, limited to the high glass gable wall facing the lake, the lower garage door header facing the lake, the main floor beam spanning into the header, and the ridge-splice support connection. The report revealed numerous areas of deficiency under the 1997 Uniform Building Code (UBC), applicable at the time of construction. The report concluded, among other things, that the lower floor garage header had twice the amount of "sag" permitted by the UBC, that the ridge beam splice connection had an "alarming likelihood of failure"—since no method had been used to secure the connection—and that the glass gable wall construction was inadequate to withstand a seismic event.

¶16    In December 2008, James Johnson discovered sheets of ice cascading down the exterior walls of the home. Water also was flowing down the interior walls, causing extensive flooding throughout the home, including the basement. Inspections performed by Rocky Mountain Design and A2Z Engineering revealed that a copper pipe running through the ceiling space beneath the home's upper floor had ruptured. The pipe had frozen in the recent below-zero temperatures, as a direct result of failure to insulate the upper floor space. A2Z Engineering reported that "[g]aps between the soffit and siding were found to be in excess of one inch and in some instances as great as two or three inches . . . in substantial deviation from accepted standards of construction." Additionally, the large gaps allowed rodents to "enter the home and eat the insulation off the electrical wiring," which, the report concluded, created substantial risk of fire damage:

. . . had the home not flooded[,] it likely would have been an eventual loss due to fire. Full culpability for this incident lies with the general contractor for not properly sealing and weatherproofing the home.

A2Z Engineering recommended that the home "immediately be dried out by a qualified disaster restoration team" and that the pipes be drained and filled with antifreeze.

¶17 Beaudette Consulting Engineers inspected the home twice in October 2009 and found numerous structural defects—including lateral shifting of ridge corbels at post locations in the roof, lack of positive fasteners in the roof framing between the ridges and purlins to log columns, improperly sized log joists, excessively loaded floor joists, laterally unstable stairs, an overstressed header beam above the garage door, and inadequate log wall pinning. The report clarified that these findings were considered "preliminary in nature."

¶18 In January 2010, the Johnstons hired Rocky Mountain Design to deconstruct the home. Clare prepared an expert report regarding the cost to dismantle and rebuild the home—$25,900 and $627,000, respectively—and provided a list of the major problems discovered upon deconstruction. "During the demolition phase of the home," he reported, "we discovered many deficiencies that are too numerous to list." According to Clare, the number of "hidden defects with the home, and the fact that many of the deficiencies affected the structural integrity of the house," confirmed that he would not have been able to renovate the old structure and that demolition was the "correct course of action."

8

¶19    Defects discovered upon demolition included: (1) Both decks were supported solely by rotten structural logs, which "disintegrated and broke" during removal and "would probably have gone unnoticed until the collapse of the deck." The rotting resulted from the "lack of any proper valley drainage" coupled with a "very poor roof/valley design." (2) Outside water infiltration from the second level deck, resulting from a poorly designed roof valley, caused rotting of the structural log wall under the apex of the deck. (3) Outside water infiltration from the second level deck resulted in extensive interior water and mold. (4) A lack of sealing and weatherproofing allowed air infiltration and massive rodent infestation in "almost every wall and ceiling cavity of the home," with up to fifteen dead mice found in one wall cavity. (5) Logs within the home had checked excessively, in violation of the building code. (6) The post and beam in the upper loft connection were turning, rolling and splitting, as was the corbel supporting that intersection—to the point of nearly splitting in two. Directly above that intersection, a third ridge beam, which supported the roof, lacked any mechanical connectors. (7) The log structure was not secured to the foundation with mechanical fasteners; during deconstruction, Rocky Mountain Design was able to slide the home off the main sub-floor where it had been resting. (8) No hurricane connectors or structural hold downs had been applied to the thirty-three-foot tall glass gable. (9) The deck joists used on the exterior decks were not nailed properly—many sat loose within their hangers or had fallen out. (10) Poor and inconsistent framing practice throughout the house resulted in loose stair treads and a wobble to the finished staircase. Incomplete or missed framing in

9

the basement, including a two- or three-inch gap where it should have connected to the front gable and little connection between the entire basement level and the gable, would subject the gable wall to complete failure during a catastrophic event. The two-story chimney was primarily supported by the main floor framing, with no additional structural support. (11) The header above the garage door was overstressed and sagging due to having a large span and being undersized, the condition being exacerbated by an additional beam supporting the main floor attached to the garage door header. (12) The bottom of the posts supporting the decks showed signs of decay because they had been set at ground level, without protection from the ground surface. Due to the rotting support columns, the entry stairway was very unstable. Additionally, the log deck railing was visibly rotting. (13) The cedar skirl siding was loose, cupping and falling away from the wall, due to improper installation using staples, rather than nails.

¶20    In June 2008, Greg Johnston consulted with Charles Lewis, an attorney from Chicago, regarding the home. Lewis revised a letter written on behalf of Elvira Johnston to Centennial. In his e-mail to which the redrafted letter was attached (which was included in Centennial's summary judgment submission to the District Court), Lewis stated to Greg Johnston: "I don't want to refer to the earlier problems or the fact that the structural problems have existed for some time. This will lead to a statute of limitations defense."

¶21    On October 8, 2009, the Johnstons filed a complaint against Centennial, alleging negligent construction of the home, breach of statutory and implied warranties, and

10

violations of the Montana Consumer Protection Act and Montana Unfair Trade Practices Act. In their Amended Complaint, filed May 12, 2010, the Johnstons added as a defendant Keeko Log Homes, Ltd. (Keeko), "the designer and/or manufacturer of the log home package which was constructed by Centennial and others."

¶22 On September 2, 2011, Centennial filed a motion for summary judgment arguing that the Johnstons' claims were time-barred under the applicable statutes of limitations and also that their claims were waived by the Leonards' release. The District Court granted summary judgment to Centennial on both grounds. The court concluded that the 2004 and 2005 repairs "should have put Plaintiffs on notice of the need to have the home evaluated by someone with a background in residential home construction," at which point the "alleged self-concealing defects would have become apparent[.]" The Johnstons' negligence and Unfair Trade Practices Act claims thus accrued by 2005 and should have been filed by 2008 and 2007, respectively. The court also concluded that because "[a]ll of the Trust's ownership interest in the property arose after the execution of the release and the Trust was plainly a 'successor' to the Leonards' interest in the property," the release applied to the Johnstons' interest in the property and waived all of their claims. The court stated in a footnote: "Even if the release didn't bar all of Plaintiffs' claims, which it does, it would at the very least bar at least 64% of Plaintiffs' damages." The Johnstons appeal the District Court's summary judgment ruling.

11

¶23 On June 4, 2012, the Johnstons filed a motion to dismiss their claims against Keeko under M. R. Civ. P. 41(a)(1), which the District Court granted on June 7, 2012. Centennial cross-appeals the District Court's dismissal of Keeko.

**STANDARD OF REVIEW**

¶24 We review *de novo* a district court's summary judgment ruling. *Meloy v. Speedy Auto Glass, Inc.*, 2008 MT 122, ¶ 10, 342 Mont. 530, 182 P.3d 741. Under M. R. Civ. P. 56(c), summary judgment may be granted only "when the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show no genuine issues of material fact exist and when the moving party is entitled to judgment as a matter of law." *Fasch v. M.K. Weeden Constr., Inc.*, 2011 MT 258, ¶ 14, 362 Mont. 256, 262 P.3d 1117. The moving party has the burden of demonstrating the absence of a genuine issue of material fact. We draw all reasonable inferences and view all of the evidence in the light most favorable to the non-moving party. *Fasch*, ¶ 16. At the summary judgment stage, "the court does not make findings of fact, weigh the evidence, choose one disputed fact over another, or assess the credibility of witnesses." *Fasch*, ¶ 17 (quoting *Andersen v. Schenk*, 2009 MT 399, ¶ 2, 353 Mont. 424, 220 P.3d 675) (internal quotation marks admitted).

¶25 In Montana, "the law of contracts governs releases." *Sperry v. Mont. State Univ.*, 239 Mont. 25, 30, 778 P.2d 895, 898 (1989). "The construction and interpretation of a contract is a question of law" that we review for correctness. *Mary J. Baker Revocable Trust v. Cenex Harvest States, Coops., Inc.*, 2007 MT 159, ¶19, 338 Mont. 41, 164 P.3d

12

851. Whether an ambiguity exists in a contract also "is a question of law" that we review for correctness. *Doble v. Bernhard*, 1998 MT 124, ¶ 19, 289 Mont. 80, 959 P.2d 488.

¶26 We review for an abuse of discretion a district court's discretionary rulings, including the court's order granting voluntary dismissal under M. R. Civ. P. 41(a)(2). *Teal, Inc. v. Wiedrich*, 259 Mont. 323, 326, 856 P.2d 543, 545 (1993).

## DISCUSSION

¶27 1. *Whether the District Court erred in concluding as a matter of law that the Johnstons' claims are barred by the applicable statutes of limitations.*

¶28 The Johnstons' claims for negligence and breach of warranty were subject to a three-year statute of limitations. Section 27-2-204(1), MCA. Their claims under the Unfair Trade Practices Act were subject to a two-year statute of limitations. Section 27-2-211(1)(c), MCA (providing that statute of limitations for "a liability created by statute" generally is two years). The Johnstons allege that they "were unaware and could not reasonably have been aware" of many of the serious structural problems until mid-2008 and that some of the problems with the home were not discoverable until the home was deconstructed in 2010. They argue that the applicable statutes of limitations should have been tolled under the "discovery rule," which provides:

> The period of limitation does not begin on any claim or cause of action for injury to person or property until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if:
>
> > (a) the facts constituting the claim are by their nature concealed or self concealing; or

13

(b) before, during, or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause.

Section 27-2-102(3), MCA. In short, "[t]he discovery rule applies where the facts constituting the injury by their nature are concealing, or the defendant has taken some action that prevents the injured party from discovering the injury or its causes." *Burley v. Burlington N. & Santa Fe Ry. Co.*, 2012 MT 28, ¶ 17, 364 Mont. 77, 273 P.3d 825. "[W]hen there is conflicting evidence as to when a cause of action accrued, the question of whether an action is barred by the statute of limitations is for the jury to decide." *Siebken v. Voderberg*, 2012 MT 291, ¶ 23, 367 Mont. 344, 291 P.3d 572 (quoting *Nelson v. Nelson*, 2002 MT 151, ¶ 24, 310 Mont. 329, 50 P.3d 139) (internal quotation marks omitted).

¶29 The parties dispute whether genuine issues of material fact exist regarding applicability of the discovery rule. The District Court granted summary judgment in favor of Centennial based on its conclusion that the repairs the Leonards made to the home during 2004 and 2005 "should have put Plaintiffs on notice" that an inspection report was needed and its further conclusion that an inspection conducted in 2005 would have revealed the structural defects that the Leonards later discovered:

> Even assuming the Leonards' issues with the home in 2002 and 2003 did not put Plaintiffs on notice of their claim, Plaintiffs made repairs to the home in 2004 and 2005 to correct numerous problems. Plaintiffs spent approximately $50,000 doing so. That Plaintiffs did not know the exact nature of the construction defects is irrelevant . . . . At the very least, the numerous repairs made in 2004 and 2005 should have put Plaintiffs on notice of the need to have the home evaluated by someone with a background in residential home construction. Had Plaintiffs done so, the

14

alleged self-concealing defects would have become apparent, as is evident from the inspection report eventually they obtained.

¶30     The Johnstons allege that the issues with the home in 2002 were "minor flooring and aesthetic problems" and that they considered the repairs made to the home in 2004 and 2005 to be "routine maintenance issues." They argue that, in comparing the minor defects discovered in 2002 and 2005 with the problems discovered in 2008, 2009 and 2010, "it becomes clear there is no rational relationship between the two distinct categories." Thus, they contend that whether they "'should have known' of hidden defects such as the lack of critical log wall pinning, hidden mold and lack of connection to the foundation in 2005 should not have been resolved on summary judgment." Viewing the facts in the light most favorable to the Johnstons, we conclude that genuine factual issues exist regarding whether the Leonards reasonably were put on notice of the more serious structural problems by 2005, as well as whether the problems experienced by 2005 were related to those discovered in 2008 and 2010.

¶31     As noted, in 2002, the Leonards observed problems with the bubbling and heaving of their wood floors, discovered extensive mold underneath the floors and began to discuss these issues with Leander. Leander's December 2002 letter to Centennial's counsel complained of the flooring and mold issues and provided the following list of additional problems with the home:

1.  Kids' bathroom tile – grout is cracking
2.  Master bathroom tile – grout is cracking
3.  Kids' bathroom is missing a soap dish (promised by Centennial for over 3 months)
4.  Master bathroom shower light has fallen apart

15

5. Kitchen vent still needs to be replaced
6. Stairs still not to code
7. Loft railing needs to be sanded and repaired
8. Office wall (corner) is splitting apart (plus wood in ceiling)
9. Total site cleanup
10. Pipes need adjusting (noise)

The inclusion of a building code violation and cracking of the walls and ceiling, while supporting Centennial's argument, does not eliminate factual questions regarding applicability of the discovery rule. According to the Johnstons, these additional defects, though adding to their frustration, fairly were characterized as aesthetic problems. As noted, Sandy Leonard's deposition testimony indicated that the Leonards viewed those problems as "some minor things," their true concerns being limited to the improperly laid flooring and resulting mold infestation. A follow-up letter Leander wrote to Centennial's counsel in 2003 noted faulty installation of stairways and railings, but stated that Centennial's "malfeasance" consisted of laying flooring over gyp-crete that had not been properly cured, failing to use standard plywood for the sub-flooring, and failing to attach the sub-flooring to the gyp-crete.

¶32 Additionally, the Johnstons were aware that the logs in a newly constructed home are prone to settlement issues and require maintenance in order to stabilize. In his May 2008 report prepared on behalf of A2Z Engineering, Thomas explained that "[l]og homes are inherently prone to maintenance, settlement, and checking issues." Josh Harmon, owner of Centennial, indicated during his deposition that a "log house is designed to settle and shift" and that screw jack adjustments and other maintenance may be required in leveling the home. Centennial points out that, in 2004 and 2005, Innovative Builders

16

performed repairs of more than one staircase, as well as the home's decks, and that the Johnstons paid them approximately $50,000—an expense Centennial suggests exceeds the cost of mere maintenance. The Johnstons allege that, as first-time owners of a log home, they reasonably considered the work performed by Innovative Builders as constituting "routine maintenance" of a log home—regardless of the cost—and were led by Centennial to believe that it could take five to ten years for the home to settle. Harmon represented during his deposition that, as a log home settles, the movement of windows and doors—even to the point where they fail to close—typically is not a construction defect, but instead indicates that screw jack adjustments are required:

> The log house is designed to settle. The windows and doors are installed in such a manner that the logs can continue to settle. If a door were to bind up or a window would not open, that is – that tells you that the house is – that the jacks need to be adjusted in the house. The jacks are located on vertical posts that don't shrink in height. Logs shrink in diameter only.
> So there's support places in the house that have a[n] adjustable jack on them. If those jacks aren't adjusted properly then you can have issues with the doors and windows.

The parties thus have offered conflicting evidence regarding whether the problems discovered in 2002 and the extent of repairs made in 2004 and 2005 reasonably put the Leonards on notice of the serious nature of the problems with their home. Our well-established summary judgment standard dictates that we may not weigh the evidence or choose one disputed fact over another. *Fasch*, ¶ 17; *see also Tacke v. Energy W., Inc.*, 2010 MT 39, ¶ 16, 355 Mont. 243, 227 P.3d 601; *Andersen v. Schenk*, 2009 MT 399 ¶ 2, 353 Mont. 424, 220 P.3d 675.

17

¶33 We also agree with the Johnstons that factual questions arise in determining the extent to which the problems discovered by 2005 are related to the issues discovered between 2008 and 2010. As discussed, in 2008, the Johnsons discovered a burst water pipe that resulted from Centennial's failure to insulate the upper level of the home. Upon deconstruction of the home in 2010, Clare of Rocky Mountain Design documented many "hidden defects" and provided a list of structural problems, some of which had not been discovered through previous inspections. These included, among others, the rotting of structural logs and posts supporting the decks, due to the lack of valley drainage and lack of protection of the logs from the ground surface, the failure to seal and waterproof the walls of the home, the failure to secure the front gable to the basement level, and the failure to secure the entire log structure to the foundation. Even if the Johnstons were on notice that some structural problems existed, the evidence raised a question of fact as to whether, in the exercise of due diligence, they should reasonably have become aware of the severity of those problems prior to the time the home was deconstructed.

¶34 We disagree with Centennial that the case simply raises disputes about whether the extent of the plaintiffs' damages was known. Thus, Centennial's reliance on *E.W. v. D.C.H.*, 231 Mont. 481, 754 P.2d 817 (1988), is misguided. There, E.W., who had been molested during childhood by the defendant, filed a complaint more than twenty years later alleging various torts based on psychological damage resulting from the molestation. *E.W.*, 231 Mont. at 483, 754 P.2d at 818. The Court observed that E.W. "'always knew' she had been molested and had sought help for her psychological problems since late

18

adolescence" but only much later came to associate those psychological problems with the molestation. *E.W.*, 231 Mont. at 487, 754 P.2d at 820. The Court refused to apply the discovery rule and granted summary judgment to the defendant based on our conclusion that "[t]his is not a case in which the plaintiff was unaware of the tortious conduct or the injury has failed to manifest itself." *E.W.*, 231 Mont. at 486, 754 P.2d at 820. In contrast to E.W., who was "clearly aware of the wrongful conduct," *E.W.*, 231 Mont. at 487, 754 P.2d at 820, factual questions exist as to whether the Johnstons were, or reasonably could have become, aware by 2005 of the defendants' tortious conduct—including the failure to insulate the home or secure the walls to the foundation.

¶35    For similar reasons, we agree with the Johnstons that *Deschamps v. Treasure State Trailer Ct., Ltd.*, 2010 MT 74, 356 Mont. 1, 230 P.3d 800, factually is distinguishable. Having purchased a mobile home park from the defendant, Deschamps became aware in July 2003 of problems with the park's water distribution system: a water system well pump had failed and Deschamps replaced it. *Deschamps*, ¶ 8. In the fall of 2003, a consultant informed Deschamps that the water system was "seriously and dangerously defective." *Deschamps*, ¶ 35. By December 2003, one-half of Deschamps's tenants vacated the park, allegedly due to dissatisfaction with the water system failure. *Deschamps*, ¶ 34. Deschamps proceeded to excavate a portion of the water system in May 2004, at which point he discovered that it had been constructed with improper materials. *Deschamps*, ¶ 9. Deschamps filed a claim for actual and constructive fraud in 2007. We concluded that the fraud claim had accrued by December 2003, when

19

Deschamps learned that the water system was seriously defective and observed the occupancy rate dropping dramatically in response to water issues. The claim was thus time-barred by a two-year statute of limitations. *Deschamps*, ¶ 35. Importantly, the undisputed facts showed that Deschamps had been alerted to the serious nature of his water system failure by 2003, when he received the consultant's opinion.

¶36 Here, as discussed, evidence of when the Johnstons should have first discovered the serious construction defects in their home is "inconsistent and unclear." *See Thompson v. Nebraska Mobile Homes Corp.*, 198 Mont. 461, 469, 647 P.2d 334, 338 (1982). Factual questions exist as to whether the 2004 and 2005 repairs to the log home should have alerted the Johnstons to the potential for more serious underlying structural defects and whether those defects were self-concealing. We conclude that the question whether the facts constituting the Johnstons' claims were by their nature concealed or self-concealing or, alternatively, whether they reasonably should have been discovered by 2005 cannot be resolved at this stage in the proceedings and should be decided by the jury. Section 27-2-102(3), MCA; *Siebken*, ¶ 23; *Burley*, ¶¶ 92-93 (tolling of statute of limitations for nuisance may be a jury question).

¶37 Centennial argues as an alternative ground for dismissal of the Johnstons' Consumer Protection Act claim that "[t]he Johnstons do not fall within the definition of 'consumers'" under the Act. Because the District Court ruled in Centennial's favor on an alternative ground, it did not reach this issue. The parties discuss one case, *Estate of Donald v. Kalispell Reg. Med. Ctr.*, 2011 MT 166, 361 Mont. 179, 258 P.3d 395,

20

regarding the issue of privity. We did not use the term "privity" in *Donald*, but rejected the estate's Consumer Protection Act claim because the plaintiff had not shown any relationship with the defendant—a service provider—that would support a claim under the Act. *Donald*, ¶¶ 30-31. The Johnstons claim that they did have a sufficient relationship with Centennial to qualify as "consumers" under the Act and that the Act does not require a direct relationship in any event. Despite the language in § 30-14-104, MCA, that due consideration "shall be given" to parallel federal law, the parties cite little other authority in support of their arguments. Given its lack of development in the record or in the parties' briefs, we decline to consider this question for the first time on appeal.

¶38　2. *Whether the District Court erred in determining that the release executed by the Leonards is binding on the Johnstons.*

¶39　The Johnstons argue, first, that insofar as the Johnstons were not parties to the release, it applies only to the Leonards' interest in the property. Secondly, they argue that "the Leonards released only those claims relating to mold and flooring issues and not the significant latent deficiencies which were later found in the home." We reverse the District Court's decision that the release applied to the Johnstons' 36% interest in the property, but agree with the court's determination that the unambiguous language of the release waived the Leonards' subsequent claims.

¶40　The Leonards signed the release on April 10, 2003, at which time they owned a 64% interest and the Johnstons owned a 36% interest in the property. The Johnstons were not a party to the release and thus, the terms of the release cannot be applied to their 36% interest. *See Fordyce v. Musick*, 245 Mont. 315, 319, 800 P.2d 1045, 1047 (1990)

21

("It is elementary that a contract binds no one but the contracting parties.") (citing *Gambles v. Perdue*, 175 Mont. 112, 115, 572 P.2d 1241, 1243 (1977)). That the Leonards and Johnstons each later transferred their interest to the Johnston Trust, thus rendering the Trust "successor" to both interests, does not change the analysis. The release can be binding only on the interests owned by the Leonards at the time that they signed it; thus, as recognized by the District Court in its footnote, the release bars 64% of any damages proven by the Johnston Trust. We disagree with the Johnstons, however, that, to the extent the release applies to the Trust's interests, its terms are "reasonably susceptible to multiple interpretations" and therefore ambiguous.

¶41 Centennial cites *Rich v. Ellingson*, 2007 MT 346, 340 Mont. 285, 174 P.3d 491, where we considered the scope of a release that included similar terms. Rich had hired an attorney, Ellingson, to secure uninsured motorist and underinsured motorist (UIM) coverage from her insurer, as well as a potential Unfair Trade Practices Act or bad faith claim. *Rich*, ¶¶ 4-6. When Rich's UIM claim was dismissed due to Ellingson's failure to timely serve the insurer, she filed a malpractice claim against him. She thereafter executed a release in which she received $175,000 and agreed to absolve Ellingson from "[a]lleged legal malpractice of any kind"—including claims "asserted or unasserted, known or unknown, foreseen or unforeseen[.]" *Rich*, ¶ 9. When she later learned that her Unfair Trade Practices Act claims had been dismissed due to expiration of the statute of limitations, she filed a second legal malpractice claim against Ellingson. *Rich*, ¶ 10. We rejected her argument that the term "alleged," as used in the casualty description,

22

rendered the release ambiguous with regard to scope. *Rich*, ¶¶ 16-18. We also rejected her argument that the release applied only to the malpractice "alleged" prior to its execution, and declined to consider extrinsic evidence of the parties' intentions at the time the release was executed. We concluded that the release "clearly and unambiguously" barred any future malpractice claims against Ellingson and therefore affirmed summary judgment in his favor, noting that "[a] party's 'latent discontent' with a release, without more, is an insufficient basis upon which to premise an alteration of an express agreement." *Rich*, ¶¶ 17, 21.

¶42 Contrary to the Johnstons' assertion, the casualty described in the release clearly extends beyond the mold and flooring issues because it applies to "[d]efective construction of log home in Sunset Heights, Woods Bay, Lake County, Montana; . . . ." The Johnstons point out that the release repeatedly refers to mold issues and that the Leonards specifically reserved a claim for mold-related injury to Sandy Leonard's unborn child. The specific language regarding mold issues, however, does not limit or conflict with the release's broader application to all other construction defects, known or unknown. The Johnstons cite no authority supporting their argument that the release "can only encompass those defects the Leonards knew about or could have known about with reasonable diligence at the time of its execution." To the contrary, the explicit language of the release covered "all claims for defective construction or warranty," including claims for "any and all injuries, damages and losses resulting from the casualty described herein, even though now unanticipated, unexpected, or unknown . . . ." As discussed, the

23

"casualty" was defined to include "defective construction of log home," as one on a list of three items separately designated.

¶43 Similar to *Rich*, the Johnstons refer to extrinsic evidence of the parties' intentions at the time the document was executed—such as correspondence between the parties' attorneys—in suggesting that the contract is ambiguous. As in *Rich*, we conclude that the terms of the release are clear and unambiguous; thus, we must "apply the language as written." *Rich*, ¶¶ 13, 15.

¶44 Because the Johnstons were not a party to the release, and given our conclusion that the release was not binding on their 36% interest in the property, we need not reach the Johnstons' alternative argument that the release should be rescinded on the basis of mutual mistake.

¶45 3. *Whether the District Court abused its discretion in granting the Johnstons' motion to dismiss Keeko Log Homes, Ltd. as a defendant.*

¶46 Centennial argues that the District Court abused its discretion when it granted the Johnstons' motion to dismiss Keeko, three days after that motion was filed, without giving Centennial an opportunity to respond. Centennial also argues that the Johnstons' voluntary dismissal should have taken place under M. R. Civ. P. 41(a)(2), through discretionary court order, rather than under Rule 41(a)(1).

¶47 Under M. R. Civ. P. 41(a)(1), a plaintiff voluntarily may dismiss a defendant without a court order by filing "a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." Rule 41(a)(1) applies when "the defendant has already been joined in the lawsuit" and preserves the "unqualified right of

the plaintiff to a dismissal without prejudice prior to the filing of defendant's answer." *Rich v. St. Farm Mut. Automobile Ins. Co.*, 2003 MT 51, ¶¶ 18, 23, 314 Mont. 338, 66 P.3d 274 (quoting *Jangula v. U.S. Rubber Co.*, 147 Mont. 98, 113-14, 410 P.2d 462, 470 (1966)) (internal quotation marks omitted).  We have clarified that voluntary dismissal under Rule 41(a)(1) "automatically terminates the action upon the filing of the notice of dismissal with the clerk of court" and thus, "no court order is required."  Rule 41(a)(2), by contrast, "gives the district court discretion to dismiss an action upon the plaintiff's motion and 'upon such terms and conditions as the court deems proper.'" *U.S. Fidelity & Guar. Co. v. Rodgers*, 267 Mont. 178, 184, 882 P.2d 1037, 1040-41 (1994).  Here, the Johnstons filed a motion in the District Court to dismiss the defendant Keeko.  Although that motion sought dismissal under Rule 41(a)(1), the District Court issued an order granting voluntary dismissal, in apparent reliance on Rule 41(a)(2).

¶48   The Johnstons cite *State ex rel. Butte Teamsters Local v. Dist. Ct.*, 140 Mont. 581, 374 P.2d 336 (1962), where we applied Rule 41 to dismiss one of multiple defendants. We followed the U.S. Court of Appeals for the Third Circuit in concluding that, under Rule 41(a)(2), the district court has discretion to dismiss the case as to fewer than all of the defendants, where "[n]o objecting defendant has served any cross-claim against a moving defendant." *Butte Teamsters*, 140 Mont. at 600-01, 374 P.2d at 346.  We reasoned that "[t]he joinder of the moving defendants by plaintiffs gave their fellow defendants no vested interest in the presence of the moving defendants as co-parties"; instead, the joinder of additional defendants by the plaintiff "was a voluntary gift to their

25

co-defendants by plaintiffs and plaintiffs, having given, could take away." *Butte Teamsters*, 140 Mont. at 601, 374 P.2d at 346.

¶49 The Johnstons point out that Keeko had not filed an answer or a motion for summary judgment at the time that the Johnstons moved for voluntary dismissal and that Centennial had not filed a cross-claim against Keeko. Nonetheless, the Johnstons' motion stated that Centennial opposed dismissal of Keeko and, additionally, Centennial argues that its answer to the Johnstons' complaint included an affirmative defense alleging Keeko's liability. The answer averred that Centennial "constructed a log home manufactured and designed by Keeko Log Homes" and reserved "the defense of negligence and/or fault of other parties," as well as entitlement to "contribution or indemnification or causal apportionment." We conclude that the District Court should have provided Centennial the opportunity to brief its opposition to the motion before ordering dismissal of Keeko under Rule 41(a)(2).

**CONCLUSION**

¶50 For the foregoing reasons, we reverse the District Court's summary judgment ruling and remand the case for further factual development on the issue whether the Johnstons' claims are time-barred under the applicable statutes of limitations. The decision on remand will apply only to the 36% interest in the property owned by the Johnstons at the time that the release was executed. We affirm the District Court's conclusion that the release is binding on the Leonards' 64% interest, later transferred to the Johnston Trust. We also reverse the District Court's dismissal of Keeko and remand

26

for further consideration following full briefing on the Johnstons' Rule 41 motion to dismiss.


/S/ BETH BAKER


We concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ JIM RICE
/S/ MICHAEL E WHEAT


Justice Laurie McKinnon, dissenting.

¶51    I would affirm the judgment of the District Court concluding that the Johnstons' claims are time-barred as a matter of law.  In my view, the undisputed facts establish that the Johnstons were actually aware, or reasonably should have been aware, by 2005—if not 2002—of the wrongful act that resulted in their injuries.  I believe this Court, in its Opinion today, has rendered the statutory period of limitations provided by the Legislature meaningless.  I do not believe it is the function of this Court to selectively resurrect stale claims when the plaintiffs here actually knew of the alleged wrongful act and concomitant injuries as early as 2002.

¶52    The Legislature has determined that the statutory period for bringing an action in negligence and breach of warranty is three years.  Section 27-2-204(1), MCA.  Claims for violations of the Unfair Trade Practices Act have a two-year statute of limitations.

27

Section 27-2-211(1)(c), MCA; *Osterman v. Sears, Roebuck & Co.*, 2003 MT 327, ¶ 24, 318 Mont. 342, 80 P.3d 435. "The fact that a person entitled to an action has no knowledge of his right to sue, or of the facts out of which his right arises, does not, as a general rule, prevent the running of the statute, or postpone the commencement of the period of limitation, until he discovers the facts or learns of his right thereunder." *E.W. v. D.C.H.*, 231 Mont. 481, 484-85, 754 P.2d 817, 819 (1988) (internal quotation marks omitted) (citing *Kerrigan v. O'Meara*, 71 Mont. 1, 227 P. 819 (1924), *Carlson v. Ray Geophysical Div.*, 156 Mont. 450, 481 P.2d 327 (1971), and *Bennett v. Dow Chem. Co.*, 220 Mont. 117, 713 P.2d 992 (1986)). "Only the vigilant are viewed favorably under the law." *E.W.*, 231 Mont. at 485, 754 P.2d at 819; *see also* § 1-3-218, MCA ("The law helps the vigilant before those who sleep on their rights.").

¶53 We have previously recognized that "[t]he policy underlying the bar imposed by statutes of limitations is, at its roots, one of basic fairness. Our system of jurisprudence is designed to achieve substantial justice through application of the law after the parties have had an opportunity to fully present both sides of a controversy." *E.W.*, 231 Mont. at 484, 754 P.2d at 819. The ability to adequately prepare and present an effective defense necessarily depends on the recovery and presentation of evidence. Thus, " '[s]tatutes of limitations are regarded as statutes of repose governing the period within which actions must be brought and are designed to compel the exercise of a right of action within a reasonable time, while the evidence remains fresh in the memory of the witnesses.' "

*E.W.*, 231 Mont. at 484, 754 P.2d at 818-19 (quoting *Monroe v. Harper*, 164 Mont. 23, 26, 518 P.2d 788, 790 (1974)).

¶54    This Court has recognized, however, that some types of injuries preclude a strict application of the statutory bar. In particular, the statutory bar will not be applied to prevent the bringing of an action when the injury is self-concealing. This principle is codified in the discovery rule, § 27-2-102(3), MCA. We first applied the discovery rule in a medical negligence action where the injury was self-concealing. *Johnson v. St. Patrick's Hosp.*, 148 Mont. 125, 417 P.2d 469 (1966). We have since extended the discovery rule to other situations where the injury is not readily apparent. *See Grey v. Silver Bow County*, 149 Mont. 213, 425 P.2d 819 (1967). We have never extended the discovery rule, however, to situations where the plaintiff was aware, or in the exercise of due diligence should have been aware, of the injury. The central premise of the discovery rule is that "the plaintiff was unaware, and could not reasonably have been aware, of the wrongful act which later resulted in his or her injury until after the statute of limitations had run." *E.W.*, 231 Mont. at 486, 754 P.2d at 820.

¶55    Significantly, it is not necessary for the plaintiff to know the total extent of damages that an act causes in order to begin the running of the statutory bar. Moreover, the failure to understand the causal relationship between the wrongful conduct and the injury does not serve to toll the statutory bar. *E.W.*, 231 Mont. at 487, 754 P.2d at 820. "The law does not contemplate such discovery as would give complete knowledge before the cause of action accrues." *E.W.*, 231 Mont. at 487, 754 P.2d at 820 (citing *Mobley v.*

29

*Hall*, 202 Mont. 227, 657 P.2d 604 (1983)). To apply the discovery rule to toll the statutory bar beyond discovery of the cause of an injury would have the effect of postponing the statutory period indefinitely and denying defendants the protections of a statute of limitations.

¶56     In October or November 2002, the Leonards observed that their wood floors had begun to heave and rise, and they discovered extensive mold underneath the flooring. The Leonards communicated these problems to the Johnstons. Additionally, they noted that the stairs had not been installed according to building code and that the corner of the office wall was splitting apart. They determined that the cause of these injuries was the faulty construction of their home by Centennial. This is evidenced by the fact that the Johnstons suggested hiring counsel, Peter Leander, to notify Centennial of the problems with the home, to demand repair or compensation, and "to instill into Centennial that we mean business." Despite the Johnstons' characterization of these injuries as "minor," Centennial paid $6,000.00 and agreed to extinguish $59,704.13 still owing from the Leonards and the Johnstons on the construction contract. In return, the Leonards executed a release on April 10, 2003, for the benefit of Centennial and its subcontractors which covered "all claims for defective construction or warranty arising out of the construction" of their log home. Finally, in 2004 and 2005, the Johnstons hired a building contractor, Innovative Builders, to conduct extensive repairs to stairs, decks, and problems with settling of the logs. The Johnstons paid Innovative Builders approximately $50,000.00 to make the repairs.

¶57 Deposition testimony from the Leonards and the Johnstons established that the repair work performed in 2004 and 2005 by Innovative Builders was for structural damage. Sandy Leonard testified in her deposition that Innovative Builders "redid the stairs and . . . adjust[ed] the doors." Innovative Builders also repaired the outside decks and "some of the foundation in front of the house [that] was starting to crack." Moreover, Innovative Builders "fixed gaps in the doors" which had developed because Centennial "didn't leave room for the house to slide." Sandy explained that, due to this defect, "the house was falling on top of each other and pushing the doors out" and also "pushing the wall out." Innovative Builders had to "go in and cut out places for the house to move on top of each other." Sandy indicated that the work was for structural repair and was separate from the mold problem. Sandy was asked the following by Centennial's counsel during the deposition:

> Q. So prior to your leaving in 2005 you were starting to experience some problems with the home, windows, difficulty closing, doors not shutting, logs starting to move and some of the railings becoming loose; is that correct?
> A. Correct.

¶58 The Johnstons' position that they did not know the cause of their injuries until 2008 is particularly untenable, as noted by the District Court, in light of email correspondence with their new counsel, Charles Lewis, in June 2008. Lewis revised a letter written on behalf of Elvira Johnston to Centennial. In his email to Greg Johnston attaching the redrafted letter, Lewis explained: "I don't want to refer to the earlier

problems or the fact that the structural problems have existed for some time. This will lead to a statute of limitations defense."

¶59 In light of these undisputed facts establishing that the Johnstons actually knew of the cause of their injuries as early as 2002, I cannot conclude that there is any genuine factual dispute concerning application of the discovery rule sufficient to submit the issue to a jury. Our legal precedent is clear that it is not necessary for the Johnstons to have known the full extent of their damages or the causal relationship between Centennial's alleged wrongful acts and their injuries. Any failure of the Johnstons to understand their legal rights is likewise insufficient to toll the statute of limitations. *E.W.*, 231 Mont. at 487, 754 P.2d at 820.

¶60 The Court today submits for decision by a jury, Opinion, ¶ 36, an issue that ought to be decided as a matter of law based on clear and undisputed facts. In doing so, we have failed to follow the directives of a statute and the policy behind it—that is, the suppression of stale claims which, due to the passage of time, inhibit a party's ability to mount an effective defense. We have elevated what we apparently believe is these particular plaintiffs' entitlement to bring an action over a legislative directive designed to require all plaintiffs to be vigilant in their pursuit of a remedy.

¶61 I therefore would affirm the District Court in its decision that the Johnstons' claims are time-barred. The undisputed facts establish that the Johnstons either did discover, or in the exercise of due diligence should have discovered, the facts underlying their claims by, at the latest, 2005. The Johnstons were required to file their Unfair Trade

Practices Act claim no later than 2007 and their negligence and breach of warranty claims no later than 2008. As the Johnstons did not file their suit until 2009, their claims are barred by the statute of limitations.

¶62 Given that the Johnstons' action is time-barred, it is not necessary to address any remaining issues.

¶63 I dissent.

/S/ LAURIE McKINNON